SECOND DIVISION

July 31, 2001

No. 1-99-3283 

PREM LALVANI, 
 ) Appeal from the 

             ) Illinois Human Rights

Petitioner, ) Commission

)

v. )

) No.  1990-CA-2502      

ILLINOIS HUMAN RIGHTS COMMISSION, 
 ) 

and COOK COUNTY HOSPITAL, ) 

)

Respondents.   ) 

JUSTICE GORDON delivered the opinion of the court:

Petitioner Prem Lalvani appeals from an order of respondent Illinois Human Rights Commission dismissing his employment discrimination complaint against respondent Cook County Hospital (the hospital).  Lalvani claimed that the hospital discriminated against him because of his race and national origin, in violation of the Illinois Human Rights Act, when it failed to promote him in 1989 and again in 1990.  The Commission found that there was no discrimination on the part of the hospital. 

For the reasons set forth below, we affirm the order of the Commission.  

BACKGROUND

Lalvani filed a charge with the Illinois Department of Human Rights in May 1990 alleging discrimination by the hospital on the basis of his age (56), race (Asian) and national origin (Indian).  Lalvani, who was employed by the hospital as a social worker, alleged that he was discriminated against by being denied promotion to the position of case worker 5 in 1989 and by being denied promotion to the position of director of the department of social work in 1990.  Lalvani also alleged that beginning in September 1989 he was harassed in retaliation for filing a grievance over what he termed the discriminatory promotion of another employee, Janice Simms, to the position of associate director.  

In November 1990 the Department of Human Rights filed a complaint with the Human Rights Commission elaborating upon the allegations in Lalvani's discrimination charge.  According to the amended version of that complaint, whose allegations are essentially the same as those in the initial complaint, Lalvani was hired by the hospital in October 1966 and was working as a divisional director (in the department of social work) at the time of the incidents at issue.  In June 1989 the hospital failed to promote Lalvani to the position of Medical Social Worker V (MSW V).  Instead it promoted a non-Asian, non-Indian employee, Janice Simms, an African-American, to that position.  Prior to Simms' promotion, members of a hiring committee allegedly stated that they preferred a black whose national origin was not Indian for the MSW V position.  On September 29, 1989, two days after Lalvani filed a grievance opposing Simms' promotion, the hospital allegedly began harassing Lalvani by, 
inter alia
, reducing the number of employees who worked for him, taking away his office, and denying his vacation request.  The following year, the hospital failed to promote Lalvani to the position of director of the social work department, promoting Simms to that position instead.  According to the amended complaint, the hospital's earlier, discriminatory failure to promote Lalvani to the MSW V position hindered his chances of subsequently being promoted to the director position.  The amended complaint thus alleges that the hospital failed to promote Lalvani because of his race and national origin, and harassed him in retaliation for opposing a discriminatory practice, in violation of sections 2-102(A) and 6-101(A) of the Illinois Human Rights Act (775 ILCS 5/2-101(A), 5/6-101(A) (West 1993).  In its answer to the amended complaint, the hospital averred that its stated reason for not promoting Lalvani was that he was not as qualified as Simms.

A hearing on the amended complaint was begun before an administrative law judge (ALJ) on July 26, 1993, but was not completed within the three days the parties had anticipated.  The ALJ presiding over that hearing subsequently left the Human Rights Commission and was not available to hear the rest of the case. As a result, a new hearing was held before a different ALJ starting on May 10, 1995, and concluding on May 18, 1995.  

Lalvani testified for petitioner that he began working for Cook County Hospital on October 24, 1966, as a case worker I in the department of social work.  He rose through the ranks, and by April 1973 he was a divisional director in charge of medicine and surgery services, in which position he supervised about 23 social workers.   In 1976 he requested a transfer to ambulatory services and the request was granted.  He remained in ambulatory services, which included the hospital's family practice clinic, an outpatient clinic, and the emergency room, from 1976 to 1988. 

Lalvani testified further that his supervisor was William Love, an assistant director in the social work department.  In 1987 the department, whose structure changed from time to time, consisted of six divisions under the supervision of two assistant directors, Love and Virginia Wearring.  The three divisions reporting to Love at that time were pediatrics, obstetrics-gynecology, and ambulatory services, the latter being the division directed by Lalvani.  In August 1987, the social work department had 71 employees, 10 of whom were Asians.

According to Lalvani, in early 1988 Lucille Lopez-Wark was brought into the social work department as an assistant director.  Love subsequently left the department, and Lopez-Wark became Lalvani's supervisor.  In the fall of 1988, Wearring, who by then was director of the social work department, resigned her position, and Lopez-Wark was named acting director.  In November 1988 Lalvani filed a grievance about the appointment of Lopez-Wark to the assistant director and acting director positions, complaining that neither position had been posted and that qualified applicants thus were denied an opportunity to be promoted from within.  Lopez-Wark responded that under Cook County policy, positions of grade 20 and above, 
i.e.
, the assistant director and director positions, did not have to be posted.  Under cross-examination, Lalvani conceded that a hearing was held on this grievance and that the hearing officer denied it on the ground that there were no violations of hospital policies or procedures.  

Evidence which was admitted during Lalvani's direct testimony showed that in March 1989 Lopez-Wark reassigned Lalvani and changed his duties, assigning his emergency room responsibilities to Wayne Cebrzynski but leaving Lalvani's outpatient clinic duties intact.  Evaluation forms which were admitted into evidence showed that Lopez-Wark ranked Lalvani lower than had Love, who had consistently ranked him superior in nearly every category.  In an evaluation dated June 9, 1989, Lopez-Wark checked "no" in answer to the question whether Lalvani possessed management potential, explaining that "[h]e does not show initiative & needs reminders to complete tasks."   

Lalvani further testified on direct examination that a Social Worker V (MSW V) position became available in 1989 and that he applied for it.  Lalvani indicated that a job description for the position was provided to applicants.  According to that job description, one of the desirable work traits for the MSW V position was the "[a]bility to establish and maintain effective professional relationships with staff, other departments, and other institutions/facilities."   

Lalvani stated that in late summer 1989 he met with the five-member interview committee to discuss his application for the MSW V position.  A memo dated August 31, 1989, informed Lalvani that he had been denied promotion to that position.  According to the memo, the candidate who was chosen (Simms) had "scored highest" on an "evaluation tool" used by the interview committee, and that "Ms. Lopez-Wark concurred with the committee judgment."  At about the same time, Simms was named acting director of the social work department, replacing Lopez-Wark, who had resigned on August 24, 1989.  In September 1989 Lalvani filed a grievance complaining that he had been harassed and "[d]enied deserving promotion to [the] Case Worker V position."  The grievance was denied.  

Also in mid-1989 the position of director of the social work department became available.  Lalvani testified that he applied for that position after receiving a memo dated June 9, 1989, inviting applications for it.  Following his interview, he received a memo in August 1989 indicating that all internal candidates had been interviewed and that a national search was to be conducted.  In November 1989 Simms, who as noted had been named acting director, reassigned Lalvani to the emergency room and moved his office to an area near the emergency room.  

In 1990, following the denial of Lalvani's application for the director position, he filed his charge of discrimination with the Illinois Human Rights Commission, complaining about the hospital's failure to promote him to the MSW V and director positions.  The commission notified the hospital of the charge in a letter dated March 6, 1990.  

In mid-March 1990 Lalvani was reassigned again, this time as divisional director of centralized services.  His new position, required him, 
inter alia
, to inspect nursing homes but did not require that he supervise anyone.  Lalvani also indicated that his office was moved to the clerical staff area, and he was told to report to a Mr. Coleman, who was two or three grade levels below him.  Lalvani testified that as a result he was "very humiliated."  

On cross-examination and over petitioner's objections, the respondent introduced into evidence a letter dated July 12, 1976, from Helen Jaffe, then the director of the hospital's social service department, notifying Lalvani that he was being "reassigned from Unit Supervisor, Surgery, to Unit Supervisor, Ambulatory Services," and that his new supervisor would be William Love.  According to the letter, "[t]his move is being made in order to alleviate the tension which has existed for some months between you and your immediate supervisor, as well as between you and a number of your supervisees."    

Also testifying for petitioner was Wayne Cebrzynski, who in 1989 was the director of psychiatric social work at the hospital. In 1989 Cebrzynski was appointed to a committee whose purpose was to interview candidates for the MSW V position and to make recommendations to Andrea Munoz, the hospital's assistant administrator in clinical services.  Three of the committee's five members were African-American; a fourth, Cebrzynski, was white; and the fifth, Linda Coronado, was Hispanic.  According to Cebrzynski, at the committee's first meeting, before the start of the formal interview process, he and the other four panel members were talking informally when he heard someone comment that "we need a black person in this position."  The comment came from his left, but he said it did not come from Coronado, who was sitting to his left.  He did not recall that anyone reacted verbally to the comment. Lalvani was among the candidates who were interviewed during the committee's first meeting.

On cross-examination Cebrzynski stated that the committee met one additional time and at that time interviewed just one candidate, Simms.  He said the committee ranked the candidates twice, once after they had interviewed the first group of people, and again after the second meeting.  The panel recommended Simms for the position.  Cebrzynski said he ranked Lalvani higher than Simms, whom he ranked last.  Cebrzynski also stated that he did not consider race or national origin when ranking the candidates.

Andrea Munoz, formerly the hospital's assistant administrator in clinical services, testified for respondent that five candidates, including Lalvani and Simms, were interviewed by the committee for the MSW V position.  Munoz said the applicants' resumes were made available to the committee, but she did not provide the panel with the candidates' personnel files or evaluations.  Munoz said she wanted to make sure that nothing was given to the committee that might lead them to draw premature conclusions about the candidates.  Instead, she wanted the committee to evaluate the applicants based on the "objective tool" that the committee had developed.  According to Munoz, the committee ranked Lalvani fifth of the five candidates, and Simms was ranked first.  Munoz felt that Simms was the best candidate for the MSW V position.  

As to the director position, which also became vacant in 1989, Munoz testified that Simms was initially a member of the search committee which was formed to fill that position.  However, Simms subsequently resigned from the committee after deciding to apply for the director position herself.  The search committee ultimately sent the names of the top three candidates to the hospital director.  Lalvani was not among the top three, but Simms was.  Both the No. 1 and No. 2 candidates were from outside the hospital, and neither of them accepted the position after they were offered it.  Simms was then offered the director position, and she accepted. 

Linda Coronado, the director of volunteer services at the hospital and a member of the 1989 MSW V interview committee, testified for respondent that she did not make the comment that a black person was needed for the position, and she did not hear anyone else make that statement.  According to Coronado, race and national origin were never mentioned during the committee's meetings.  Coronado also said the committee ranked Simms as its first choice.  

Lucille Lopez-Wark testified that when she became acting director of the social work department in the fall of 1988, her duties included supervising the department's six divisional directors, two of whom were Lalvani and Simms.  Lopez-Wark said Lalvani procrastinated "in a lot of his work habits."  She added that he did have some good ideas, but that he tended "to be resistant in performing his duties."  As to Lalvani's interpersonal skills, Lopez-Wark said that at times he was condescending to staff and was not professional.  By contrast, Lopez-Wark found Simms to be competent, professional, and a leader.  She completed assignments on time.  Lopez-Wark said she agreed with the interview committee's recommendation that Simms should be named to the MSW V position.

Robert Coleman testified that in September 1990 he began assisting Simms, the director of the social work department.  As Simms' assistant, Coleman supervised Lalvani, who Coleman said was "underperforming" and "holding back his performance."  According to Coleman, Lalvani frequently read the newspaper during work time.  On cross-examination, Coleman conceded that in September 1990 when he began supervising Lalvani, he, Coleman, was a grade level 16, while Lalvani was a grade level 18 divisional director.

Diana Grant, another member of the MSW V interview committee, testified for respondent that in 1989 she was an attending physician in the hospital's family practice department.  Grant described the committee's interview with Simms as "a good interview," adding that Simms "was very comfortable with herself."  As to Lalvani's interview, Grant's recollection was that he "articulated that he deserved and was supposed to have the job."  

According to Grant, after the interviews were conducted, the committee met and used the evaluation tool they had created to discuss the impressions they had gotten from the interviews.  The evaluation tool, a copy of which was admitted into evidence, listed nine categories in which a candidate could be ranked on a scale from 60 to 100.  For example, one of the categories was "Interpersonal & Communication Skills," and another was "Understanding of Patient Needs at CCH."  For each of these categories, the committee totaled the five separate scores that each candidate had been given by the five interviewers, and an average was determined.  The averages were totaled for each candidate, and the committee then ranked the candidates in order from 1 to 5.  Grant said Simms was ranked No. 1. 

Simms testified for respondent that while serving on the search committee for the director position, she attended two of the committee's meetings and then resigned after being asked by the hospital director to apply for the position herself.  She then applied for it.

On March 3, 1997, the ALJ who conducted the hearing issued a recommended liability determination finding that Lalvani had established through direct evidence that the hospital discriminated against him on the basis of race as to the assistant director (MSW V) position, but that the hospital had proved by a preponderance of the evidence that Lalvani would not have been promoted even if the prohibited factor of race had not been considered.  The ALJ thus recommended that the allegation of race discrimination as to the assistant director position be sustained, that all other allegations be dismissed, that a cease-and-desist order be issued, and that Lalvani be awarded attorney fees and costs.  In a recommended order and decision dated April 29, 1997, the ALJ incorporated his previous recommended liability determination, recommending further that the hospital be ordered to pay Lalvani $4,120 in attorney fees and $3,041.25 in costs.  

In an order and decision dated January 30, 1998, the Human Rights Commission rejected the ALJ's recommended order and decision, remanding the case for a determination as to whether a working majority of the MSW V interview committee had considered race in its decision not to promote Lalvani.  Construing the Illinois Human Rights Act (775 ILCS 5/2-102(A) (West 1993)), the Commission concluded that "[f]or a decision to be based upon a prohibited factor in a committee context, a working majority of the committee must rely on the prohibited factor."  According to the Commission, it is not enough that one committee member out of five relies on a prohibited factor in making an employment decision.  In such a situation, where each member has an equal vote, it is inaccurate to say that the committee as a whole considered a prohibited factor. "If the majority does not consider a prohibited factor in coming to a decision, then that decision is not discriminatory."  

The ALJ subsequently issued a supplemental recommended order and decision finding that there was no evidence that a working majority of the MSW V interview committee considered Lalvani's race in deciding not to promote him.  Thus the ALJ recommended that the entire complaint and underlying charge be dismissed with prejudice.  In August 1999 the Commission affirmed that ruling, ordering that Lalvani's complaint be dismissed with prejudice.  The instant appeal followed.     

DISCUSSION

Contentions on Appeal

Lalvani argues on appeal that the Commission erred in holding that a decision of a hiring committee does not violate the Human Rights Act unless a working majority of the committee relies on a prohibited factor.  Lalvani argues further that the discriminatory comment of one member of the 1989 MSW V committee constituted direct evidence of discrimination, and that the Commission therefore erred in failing to shift the burden of proof to the hospital.  Thus Lalvani contends that the hospital should have been required to plead and prove with objective evidence that it would have reached the same decision as to Lalvani's promotion even without the consideration of race.  

Lalvani's main argument as to the "working majority" issue is that this concept does not apply in the instant case where the interview committee's decision was made not by majority vote but by averaging the scores given to each candidate by the five committee members.  According to Lalvani, one biased committee member could have a disproportionate impact on the panel's decision by intentionally ranking certain candidates very low and others very high.  In such a situation, Lalvani argues,  it is not necessary that a single biased committee member influence a majority of the committee in order to affect the outcome.  Hence Lalvani contends that the Commission erred by requiring in this instance that a working majority of the committee consider a prohibited factor.  The hospital argues that the reasoning underlying the Commission's "working majority" holding is consistent with the interpretation of similar federal statutes, as well as with the causation requirement set forth in the Human Rights Act, and that Lalvani's argument that one biased committee member could numerically skew the outcome is "purely speculative" and without support in the record. For the reasons discussed below, we agree with the hospital.  

Analysis

It is undisputed that the Commission arrived at its "working majority" conclusion by interpreting section 2-102 of the Human Rights Act, which provides in pertinent part that it is a civil rights violation "[f]or any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status."  775 ILCS 5/2-102(A) (West 1993).  The specific language construed by the Commission states that "[i]t is a civil rights violation *** [f]or any employer to *** act with respect to *** promotion *** 
on the basis of
 unlawful discrimination or citizenship status."  (Emphasis added.)  775 ILCS 5/2-102(A) (West 1993).  The Commission focused on the causation portion of this provision in concluding that it cannot be said that a 
committee
 acted on the basis of discrimination unless it is shown that a working majority of the committee relied upon a prohibited factor in making its decision.  The Commission reasoned that a working majority must be shown to have relied n the discriminatory factor, since the committee could operate only through its working majority.  In this regard we note, as shall be more fully discussed below, that while a reviewing court is not bound by an administrative agency's interpretation of a statute, substantial deference is accorded such an interpretation made by the agency charged with administration and enforcement of the statute.  
Bonaguro v. County Officers Electoral Board
, 158 Ill. 2d 391, 398, 634 N.E.2d 712, 715 (1994); 
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 97-98, 606 N.E.2d 1111, 1121 (1992). 

The speculative nature of Lalvani's argument can be seen by examining the example he uses to illustrate it.  According to Lalvani, given the evaluation tool in which applicants were rated on a scale of 60 to 100 in nine categories, if one biased committee member gave Lalvani the minimum score of 540 (
i.e.
, 60 in each of the nine categories), even if the other four members gave him a perfect score (900), his average, obtained by dividing the total by five, would be what Lalvani terms "a middling 828."  Lalvani then assumes that "unbiased interviewers are not likely to give perfect scores," and concludes that if four unbiased interviewers rated Lalvani 95 rather than 100 in each of the nine categories, and the biased committee member rated him 60, his average score would be 792.  Meanwhile, if the same biased committee member rated Simms 100 in each category, and if the four unbiased members all gave her 86 in each category, her average would be 799, higher than Lalvani's corresponding 792.  

This example rests on a number of assumptions, none of which is supported by the evidence.  Since the individual rating sheets are not included in the record on appeal, we have no way of knowing what scores each interviewer gave each candidate.  What we do know from the evidence is that at least one of the committee members might have rated Simms considerably lower than 86.  Cebrzynski testified that he rated Simms last of the five candidates.  Moreover, if we alter the numbers in Lalvani's example, even slightly, the outcome changes dramatically.  If, for example, the four unbiased interviewers all gave Simms 85 in each category rather than 86, then her average score would be 792, the same as Lalvani's score in the example.  If they gave her 84, her average score would be 785.  Of course, this is based on the assumption that 
all
 of the unbiased interviewers would have given Simms the same ranking in all categories.  Lalvani does not address the probable result if, as is more likely, the individual committee members' ratings of the candidates varied from member to member, and from category to category.  Thus the speculative framework upon which Lalvani bases his example is exceedingly fragile and tenuous.  We note additionally that Lalvani cites to no authority to support his argument here.   

The Commission's "working majority" holding finds support in 
Barbano v. Madison County
, 922 F.2d 139, 142 (2
nd
 Cir. 1990), a Title VII (42 U.S.C. §2000e 
et seq.
 (1994)) gender discrimination case.
(footnote: 1)   According to the court in 
Barbano
, "discrimination by one individual does not necessarily imply that a collective decision-making body of which the individual is a member also discriminated."  
Barbano
, 922 F.2d at 142.  That accords with the Commission's assertion that a single committee member's reliance on race does not necessarily mean the entire committee relied on race in making its decision.  As noted, the Commission held that in the instant case there is discrimination within the meaning of the Human Rights Act only if a working majority of the committee relied upon a prohibited factor.    

Further support for this "working majority" requirement, which derives from the Commission's construction of section 2-102(A) of the Human Rights Act, is found in the well-recognized principle that substantial weight and deference are accorded an administrative agency's interpretation of a statute.  See 
Bonaguro
, 158 Ill. 2d at 398, 634 N.E.2d at 715.  "A significant reason for this deference is that an agency can make informed judgments upon the issues, based on its experience and expertise."  
Bonaguro
, 158 Ill. 2d at 398, 634 N.E.2d at 715.  

Notwithstanding the foregoing, Lalvani argues that 
Barbano
, a case relied upon by the hospital, does not support the proposition for which it is cited, that "discrimination by one individual does not necessarily imply that a collective decision-making body of which the individual is a member also discriminated."  
Barbano
, 922 F.2d at 142.  Under the facts in 
Barbano
, the court held that the discriminatory comments of one member of an interviewing committee were sufficient to uphold a finding of discrimination in the hiring decision.  Lalvani points particularly to the 
Barbano
 court's conclusion that "knowing and informed toleration of discriminatory statements by those participating in the interview constitutes evidence of discrimination by all those present."  
Barbano
, 922 F.2d at 143.  Lalvani thus appears to argue that in the instant case the committee acquiesced to the discriminatory comment and thus the committee as a whole could be found to be biased.  We disagree.  
Barbano
 is clearly distinguishable from the case at bar.  

The plaintiff in 
Barbano
 had complained of gender discrimination on the part of defendants, based on comments made by one member of a hiring committee which interviewed her for the position of director of a veterans' service agency.  The committee ultimately recommended another candidate, a male, for the position.  During the committee's interview of the plaintiff, one member stated that he would not consider "some woman" for the position.  He then asked the plaintiff if she was planning on having a family, and whether her husband would object to her transporting male veterans.  The plaintiff stated that the questions were irrelevant and discriminatory, but the questioner replied that they 
were
 relevant because he did not want to hire a woman who would get pregnant and quit.  Another committee member, the panel's chairman, interjected that he thought the questions were relevant.  None of the committee members rebuked the questioner, none objected to the questions, and none told the plaintiff that she need not answer them.  The questioner then asked the plaintiff again if her husband would object to her "running around the country with men," and said he would not want his wife to do it. 

In affirming the finding of discrimination, the court in 
Barbano
 emphasized the acquiescence of the other committee members to the discriminatory line of questioning, and concluded that the court below could have found that those present at the interview, and not merely the questioner, had discriminated against the plaintiff.  In the instant case, by contrast, the only discriminatory comment came not during an interview but prior to the formal interview process.  No applicants were present, and thus, unlike in 
Barbano
, there was no one who labeled the comment discriminatory.  The individual who made the comment was never identified.  Cebrzynski, the committee member who stated that he heard the comment, also said he did not consider race in ranking the candidates.  Coronado, the only other committee member who testified about the discriminatory statement, said the same thing, adding that she did not hear the comment.  Unlike 
Barbano
, there is nothing in the record before us to indicate that there was any "knowing and informed toleration of discriminatory statements" on the part of the committee.  
We therefore conclude that, contrary to Lalvani's contentions, 
Barbano
 does lend support to the Commission's "working majority" position.

Lalvani argues alternatively that in other cases where courts have considered the impact of bias in a collegial decision-making process, no Title VII plaintiff has been required to show that a majority of a group of decision-makers was biased.  Lalvani points first to 
Price Waterhouse v. Hopkins
, 490 U.S. 228 (1989), 
modified by statute
, 42 U.S.C. §2000e-2(m), §2000e-5(g)(2)(B)(i) (1994),
(footnote: 2) but his reliance on this case is misplaced.  In 
Price Waterhouse
, which will be discussed in a different context below when we consider Lalvani's burden-shifting argument, the plaintiff, Ann Hopkins, sued 
the defendant accounting partnership under Title VII, alleging sex discrimination in the firm's failure to admit her as a partner.  Part of the defendant's screening process for partner candidates consisted of inviting all partners to submit written comments on each candidate.  In Hopkins' case, several of the negative comments were clearly sexist.  The defendant argued that those comments did not necessarily show that the firm's policy board had discriminated against the plaintiff, but the court rejected that argument, emphasizing that the partnership had solicited evaluations from all of the firm's partners, and that it had not disclaimed reliance on the particular comments at issue.  It is true that, as Lalvani notes, the plaintiff in 
Price Waterhouse
 was not required to show that a majority of the policy board was biased, but that was likely because the defendant invited the comments in the first place, and it did nothing to disavow reliance on those comments.  The question of whether a majority was influenced by the discriminatory comments was not at issue and hence was not discussed.  By contrast, in the instant case, where that issue is in focus, there was no evidence that the sole discriminatory comment was invited by the interview committee, nor was there any evidence that the committee relied upon that comment in making its decision.  The only evidence as to reliance went the other way: both Cebrzynski and Coronado testified that their decisions were 
not
 based on race or national origin. 

Lalvani also relies upon 
Lam v. University of Hawaii
, 40 F.3d 1551 (9
th
 Cir. 1994), and 
Gutzwiller v. Fenik
, 860 F.2d 1317 (6
th
 Cir. 1988), but in these cases, just as in 
Price Waterhouse
, there was little question that the group of decision-makers was influenced by biased individuals.  In 
Lam
, the plaintiff, 

a female of Vietnamese descent, claimed that the defendant university's law school discriminated against her on the basis of race, sex and national origin when she applied for the position of director of the law school's Pacific Asian Legal Studies (PALS) program.  The court in 
Lam
 reversed the lower court's award of summary judgment in favor of the defendants, holding that there was sufficient evidence of bias on the part of at least two male professors to preclude summary judgment.  In reaching that decision, the court noted that because the law school's faculty was small (15 members) and because "great emphasis [was] placed on collegiality and consensus decisionmaking, even a single person's biases may be relatively influential."  
Lam
, 40 F.3d at 1560.  The court added: "That is particularly true where, as here, that person plays a significant role in the selection process and leads the fight pro or con with respect to a particular candidate."  
Lam
, 40 F.3d at 1560.  This second sentence highlights the difference between 
Lam
 and the instant case.  In 
Lam
, unlike here, the influence of one of the above-mentioned male professors was obvious.  That professor, who had a previous "run-in" with the plaintiff and who had a biased attitude toward women and Asians, headed the law school's PALS appointments committee for a month and had disparaged the plaintiff's abilities before the committee and the faculty as a whole, asserting at one point that she "was unfit to teach anywhere on the [university's] campus."  
Lam
, 40 F.3d at 1556.  As the court noted, he played "a significant role in the selection process" and led the fight against the plaintiff in that process.  There was thus little question as to that professor's influence.  By contrast, in the instant case, the person who allegedly made the discriminatory comment during the MSW V interview committee meeting was never identified.  In addition, the comment was a one-time occurrence.  Thus it can hardly be said that this comment was equivalent to a continuous fight on the part of a committee chairman against the specific candidate in question.  Further, as noted, the only evidence in the instant case as to influence indicated that the interview committee was not influenced by the comment. 

In 
Gutzwiller
 there was even less question than in 
Lam
 as to whether the group of decision-makers was influenced by discriminatory individuals.  The plaintiff in 
Gutzwiller
, a female assistant professor in the defendant university's classics department, claimed that defendants' decision to deny her tenure was the result of sex discrimination.  The court in 
Gutzwiller
 upheld a finding of discrimination against two of the defendants, the head of the classics department and the chairman of the department's tenure committee, rejecting their argument that they were only two votes in a process that required decisions at four different levels.  However, as in 
Price Waterhouse
 and 
Lam
, there was little question that these two defendants influenced the tenure decision.  The evidence showed that most of the members of the tenure committee, "by their own admission, lacked the expertise to properly judge [the plaintiff's] work and, therefore, relied exclusively upon the opinion of [the committee chairman]."  
Gutzwiller
, 860 F.3d at 1327.  The committee chairman and the department head also gave the dean of the college of arts and sciences, who also had a say in the tenure decision, "consistently negative interpretations *** [of] what were generally favorable evaluations of [the plaintiff's] scholarship."  
Gutzwiller
, 860 F.3d at 1326.  There was also evidence that these two defendants, who were "the most powerful members of the Department," told at least one member of the tenure committee that they intended to vote against tenure for the plaintiff.  Unlike the instant case, where the alleged discriminatory influence consisted of one comment from an unidentified individual, in 
Gutzwiller
 the discriminatory influence consisted of actions (negative interpretations of evaluations of the plaintiff's scholarship) as well as comments.  Given the clear distinction between the facts of the instant case and those in 
Gutzwiller
, there is no reason here to disturb the findings of the Commission.  

Accordingly, we defer to the Human Rights Commission's interpretation of section 2-102(A) of the Human Rights Act (see 
Bonaguro
, 158 Ill. 2d at 398, 634 N.E.2d at 715; 
Abrahamson
, 153 Ill. 2d at 97-98, 606 N.E.2d at 1121), and conclude that the Commission did not err in holding that in a committee context, there is no statutory violation unless a working majority of the committee considered a prohibited factor in making its decision.  

Lalvani next argues that he provided direct and circumstantial evidence establishing that race was a significant factor in the interview committee's decision not to promote him.  In establishing the bias of the one committee member, he thus contends that the Commission erred, on the basis of that evidence, in not shifting the burden of proof to the hospital.  According to Lalvani, the hospital should have been required to prove that it would have made the same decision with regard to Lalvani even if race had not been considered.  The hospital argues that since Lalvani failed to show that a working majority of the committee relied upon race in making its decision, he failed to show that race was a significant factor, and thus the burden of proof did not shift.  We agree with the hospital. 

In analyzing employment discrimination actions brought under the Human Rights Act, our Supreme Court has adopted the analytical framework set forth in United States Supreme Court decisions addressing claims under Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act.  
Zaderaka v. Illinois Human Rights Commission
, 131 Ill. 2d 172, 178, 545 N.E.2d 684, 687 (1989). Under this analysis, a plaintiff may prove discrimination in one of two ways.  He may attempt to meet his burden by presenting direct evidence that race was a determining factor in the employment decision, or he may use the indirect method of proof for Title VII cases set forth in 
McDonnell Douglas Corp. v. Green
, 411 U.S. 792 (1973), and in 
Texas Department of Community Affairs v. Burdine
, 450 U.S. 248 (1981).  Under the 
McDonnell Douglas
/
Burdine
 approach, once the plaintiff establishes a 
prima facie
 case of unlawful discrimination, the burden of production shifts to the employer to articulate, not prove, a legitimate, nondiscriminatory reason for its decision.  See 
Zaderaka
, 131 Ill. 2d at 178-79, 545 N.E.2d at 687.  If the employer carries its burden of production, the plaintiff "must then prove by a preponderance of the evidence that the employer's articulated reason was not its true reason, but was instead a pretext for unlawful discrimination."  
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687.  In this approach, the ultimate burden of persuading the trier of fact that there was unlawful discrimination remains at all times with the plaintiff.  
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687. 

The burden of proof is different if the plaintiff proceeds under the direct-evidence approach.  Under 
Price Waterhouse v. Hopkins
, 490 U.S. 228 (1989), 
modified by statute
, 42 U.S.C. §2000e-2(m), §2000e-5(g)(2)(B)(i) (1994), once a plaintiff in a Title VII case establishes by direct evidence that the employer placed substantial reliance on a prohibited factor, the burden
 shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision even if the prohibited factor had not been considered.  
Price Waterhouse
, 490 U.S. at 258; 271, 277 (O'Connor, J., concurring).  Thus, where there is direct evidence of substantial reliance on an illegitimate criterion, as opposed to the indirect evidence of the 
McDonnell Douglas
/
Burdine
 approach, the employer has not merely a burden of production but a burden of persuasion.  See 
Price Waterhouse
, 490 U.S. at 277 (O'Connor, J., concurring).  Lalvani asserts that he has established a 
Price Waterhouse
 case and that the burden of proof, not production, thus should have shifted to the hospital.  As noted, we disagree.

It is clear in the instant case that Lalvani has failed to establish by direct evidence that race was a substantial factor in the interview committee's decision not to promote him.  The evidence most likely to have met that burden was the comment overheard by Cebrzynski that a black person was needed for the MSW V position.  In order to qualify as direct evidence, that comment would have to prove the particular fact in question, without reliance on inference or presumption.  See 
Hunt-Golliday v. Metropolitan Water Reclamation District
, 104 F.3d 1004, 1010 (7
th
 Cir. 1997).  The fact in question is that the interview committee placed substantial reliance on race in making its decision.  However, as noted, we have affirmed the Commission's finding that neither that comment nor any other evidence in this record establishes that a working majority of the committee relied upon race in making its decision.  Since we also affirmed the Commission's holding that in a committee context, there is no violation of the Human Rights Act unless a working majority of the committee did so rely, Lalvani thus has failed to establish a 
Price Waterhouse
 case.  The "we need a black" comment cannot establish such reliance without an inference that the comment influenced a working majority of the committee, and as shown, there is no evidence to support such an inference.  Accordingly, we conclude that the burden of proof in this case did not shift to the hospital but remained with Lalvani.

If a plaintiff cannot satisfy the 
Price Waterhouse
 threshold, the case is decided based on the 
McDonnell Douglas
/
Burdine
 approach.  See 
Price Waterhouse
, 490 U.S. at 278-79
 
(O'Connor, J., concurring).  As noted, under that approach the first step is for the plaintiff to establish a 
prima facie
 case of unlawful discrimination, a requirement which we believe Lalvani has not met for the reasons discussed.
(footnote: 3)  We need not determine whether Lalvani in fact established a 
prima facie
 case here, since the hospital has already satisfied whatever requirement it might have had if Lalvani had established such a case.  "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant."  
United States Postal Service Board of Governors v. Aikens
, 460 U.S. 711, 715 (1983).  
Here, the evidence clearly supports the existence of legitimate, nondiscriminatory reasons for the hospital's decision, including the hospital's stated reason that Lalvani was less qualified than Simms.  According to the record evidence, Lalvani had difficulty with interpersonal relations, which would have impacted any appointment to any supervisory position.
(footnote: 4)  A letter dated July 12, 1976, from the director of the hospital's social service department notified Lalvani that he was being transferred to a different unit "in order to alleviate the tension" which had existed for some months between Lalvani and his supervisor, and between Lalvani and a number of his supervisees.  Lucille Lopez-Wark, who supervised both Lalvani and Simms, testified that Lalvani was at times condescending to staff and was not professional, while Simms was competent, professional, and a leader.  Lopez-Wark also testified that Lalvani procrastinated in his work habits, and tended to be resistant in performing his duties.  
Diana Grant, a member of the interview committee, testified that the committee had a good interview with Simms, who Grant said was "very comfortable with herself," while Lalvani, in his interview, "articulated that he deserved and was supposed to have the job."  
Under a 
McDonnell Douglas/Burdine
 analysis, the burden thus would have shifted to Lalvani to prove by a preponderance of the evidence that the legitimate, nondiscriminatory reason was actually a pretext for unlawful discrimination.  The record does not show that Lalvani met this burden.

For the reasons set forth above, we conclude that the Commission did not err in failing to shift the burden of proof to the hospital.  Hence it follows that the hospital was not required to plead and prove by objective evidence that it would have reached the same decision even without consideration of race.

Moreover, even if Lalvani had established a 
Price Waterhouse
 case, and the burden of proof had shifted to the hospital, the Commission's finding that the hospital satisfied its 
burden by a preponderance of the evidence would not have been against the manifest weight of the evidence.  As noted, the "we need a black" comment was overheard by only one committee member, Cebrzynski.  Coronado, the only other committee member to testify about the comment, stated that she did not hear it, and both Cebrzynski and Coronado testified that race did not play a part in their decision.  In addition, there clearly were legitimate, nondiscriminatory reasons for the decision.  There was testimony from several witnesses that Lalvani had problems with interpersonal communications, which would impact any appointment to any supervisory position.   He was transferred in 1976 because there had been tension between him and his supervisor, as well as between him and his supervisees.  Even more recently, Lucille Lopez-Wark, who began supervising Lalvani in 1988, testified that he was condescending to staff, and that he procrastinated and tended to be resistant in performing his duties.  
Diana Grant, a third member of the interview committee, stated that Lalvani, in his interview, "articulated that he deserved and was supposed to have the job."

Accordingly, for all of the reasons discussed above, we affirm the decision of the ALJ and the Commission. 

Affirmed.

CAHILL, P.J. and COUSINS, J., concur.    

FOOTNOTES
1:
Similar to section 2-102(A) of the Illinois Human Rights Act, section 2000e-2(a)(1) of Title VII states that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. §2000e-2(a)(1) (1994).  

2:
Section 107 of the Civil Rights Act of 1991, codified at 42 U.S.C. §2000e-2(m), §2000e-5(g)(2)(B)(i) (1994), modified          
Price Waterhouse
.  See 
Landgraf v. USI Film Products
, 511 U.S. 244, 251 (1994).  In 
Price Waterhouse
, the court held that a plaintiff who proves that a prohibited factor played a motivating part in the employer's decision may not recover damages if the employer proves that it would have made the same decision in any event. Under 
Price Waterhouse
 as modified, even where the defendant has made such a proof, the plaintiff may obtain limited relief in some instances.  This modification is not implicated in the instant case.  

3:
According to 
McDonnell Douglas
, a plaintiff may establish a 
prima facie
 case of racial discrimination by showing: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."  
McDonnell Douglas
, 411 U.S. at 802.  

4:
As noted previously, one of the desirable work traits listed in the job description for the MSW V position was the "[a]bility to establish and maintain effective professional relationships with staff, other departments, and other institutions/facilities."