2020 IL App (1st) 190419-U

No. 1-19-0419

SIXTH DIVISION

February 14, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| YUHE D. WEMBI, | ) | Petition for Direct |
| | ) | Administrative Review of a |
| Petitioner-Appellant, | ) | Decision of the Human Rights |
| | ) | Commission |
| v. | ) | |
| | ) | No. 2013 CF 1630 |
| THE DEPARTMENT OF HUMAN RIGHTS, THE | ) | |
| HUMAN RIGHTS COMMISSION, and METRO AIR | ) | |
| SERVICE, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The Illinois Human Rights Commission did not abuse its discretion in sustaining the Illinois Department of Human Rights' dismissal of the complainant's employment discrimination charge where there was no substantial evidence of race discrimination and the employer offered a legitimate non-discriminatory reason for reducing the complainant's work hours.

¶ 2    Petitioner Yuhe D. Wembi (Wembi) appeals *pro se* from an order of respondent Illinois Human Rights Commission (Commission) sustaining the dismissal by the Illinois Department of Human Rights (Department) of Wembi's employment discrimination charge against respondent Metro Air Service (Metro Air) pursuant to the Illinois Human Rights Act (the Act) (775 ILCS 5/5-101 *et seq.* (West 2012)). This is a direct appeal of the Commission's decision to this Court pursuant to § 5/8-111(B) of the Act (775 ILCS 5/8-111(B) (West 2012)) and Supreme Court Rule 335 (eff. July 1, 2017). Wembi contends the Commission erred in dismissing his case for lack of substantial evidence where the Department had evidence supporting his charge, his own evidence was not taken into consideration, Metro Air's evidence was "incorrect," he now has new evidence, and his attorney colluded with the Department and the Commission. We affirm the decision of the Commission.

¶ 3                                    BACKGROUND

¶ 4    In December 2012, Wembi filed a charge of racial discrimination with the Department alleging that his employer Metro Air had reduced his work hours on November 14, 2012, because he is black. He alleged he was hired on November 16, 2011, and his job performance met Metro Air's legitimate expectations but, on November 14, 2012, after the hire of three non-black employees on his shift, Metro Air reduced his hours from 40 hours per week to 19 hours per week. Wembi claimed his supervisor gave no reason for the reduction and did not reduce the hours of similarly situated non-black employees.

¶ 5    The Department assigned an investigator to Wembi's charge, who interviewed Wembi as wells as Metro Air employees Bob Miller and Thomas Ziebell and reviewed employee compensation reports. The investigator's report noted that Metro Air sorted and distributed

shipments for the United States Postal Service (UPS) and that Wembi was hired as a part-time sorter on November 16, 2011. Metro Air admitted Wembi's job performance met its expectations and that his work hours were reduced sometime in November 2012. It denied they were reduced due to his race.

¶ 6     Wembi told the investigator that, when he was first hired, he worked approximately two hours per night, on the overnight shift four or five days per week. In August 2012, Metro Air got a "new contract," and Wembi's manager, Ziebell, advised him that it would be better for him to work on the new contract because he would be able to work mornings and get more hours per week. Wembi then started working days, "getting" between 40 and 45 hours per week. In November 2012, Metro Air hired three non-black employees and reduced Wembi's hours to 16 hours per week. Wembi spoke to Ziebell about the reduction in hours three times but was told that there was nothing Ziebell could do.

¶ 7     Bob Miller, Metro Air's vice president of operations, told the investigator that Metro Air was a third-party contractor that facilitates shipment of mail between USPS and FedEx. It had two operations: SNET and CDF. Wembi worked the SNET operation from the time of his hire until September 2012, when Metro Air "picked up the CDF contract." CDF operation employees unloaded mail trucks coming from Newark, New Jersey, and sorters reloaded the mail into containers which were then transported to the USPS.

¶ 8     Ziebell told the investigator that, when the CDF operation began, additional manpower was needed. Ziebell therefore took some employees from the SNET operation and put them on CDF. Those employees went back to SNET in October or November 2012 after he hired three new people to work on the CDF operation. When the CDF operation began, Metro Air had five or six

employees scheduled to wait on incoming trucks, but the trucks were not arriving on time. He reduced hours for the CDF operation in September or October 2012 in order to "work more efficiently and to control costs." Wembi asked Ziebell "a couple of times" why his hours had been reduced. In October or November 2012, Ziebell offered Wembi additional evening hours on the SNET operation, but Wembi said he "couldn't."

¶ 9    The investigator reviewed Metro Air's employee compensation reports showing employees' average weekly hours from July 23, 2012, to November 25, 2012.[1] The investigator's synopsis showed Wembi averaged 27.79 hours per week during that time period, 12 non-black employees and one black employee averaged more hours than Wembi, and 15 non-black employees and one black employee averaged fewer hours than he did during the same period. The investigator stated that the reports showed Wembi averaged 9.96 hours per pay period in August 2012, the month before the CDF operation began, and 32.6 hours per pay period in September 2012 when the CDF operation began. In October and November 2012, he averaged 44.25 hours per pay period and 28.6 hours per pay period, respectively. In November, his weekly hours averaged 5.1 hours, 43.3 hours, 35.06 hours, and 24.74 hours.

¶ 10    In rebuttal, Wembi acknowledged that Ziebell offered him extra overnight hours. He told Ziebell that he could no longer work the overnight shift as he had other responsibilities. Wembi stated that some of his co-workers worked both overnight and morning shifts to get extra hours.

¶ 11    The investigator determined that there was no substantial evidence to support Wembi's race discrimination charge. The investigation revealed that Metro Air scheduled its employees to

---

[1] The Department's synopsis of work hours is based on exhibits that are not included in the record on appeal.

work based on "operational needs and employee availability," not on race, and that between July and November of 2012, Wembi worked more hours than 52% of his non-black coworkers. Moreover, Wembi had declined Metro Air's offer of additional overnight hours. The investigator concluded that there was no evidence that Metro Air reduced Wembi's hours due to his race. The Department dismissed Wembi's charge on January 14, 2014.

¶ 12     Wembi filed a request for review of the Department's dismissal with the Commission. He alleged that the evidence Metro Air provided to the Department was inaccurate and that the Department investigator and his former attorney had "collaborated with Metro Air." Wembi attached as new evidence a photograph of an undated spreadsheet showing the one-week schedule of certain Metro Air employees. It shows that he was scheduled to work 8 hours that week, less than the 14 to 18 hours the other four employees were assigned.

¶ 13     The Department's response recited the findings of its investigation. In particular, the Department noted that Metro Air admitted Wembi was meeting its expectations and that his work hours were reduced, but denied the reduction was based on race. Rather, all Metro Air's mail sorters are part-time employees, and non-black mail sorters' hours were also reduced due to changes in operational needs. Metro Air stated that there are no set shifts and that start times vary depending on when inbound trucks arrive at Metro Air's facility for mail sorting. A supervisor is responsible for ascertaining the arrival time of mail trucks and "calling in the appropriate number of workers" depending on worker availability and willingness to work. There is no written policy concerning Metro Air's scheduling procedures. From September 2012 through November 2012, Metro Air temporarily assigned SNET mail sorters to help the CDF operation, while it hired

additional CDF workers. On October 10, 2012, Metro Air hired Aljazi Zaid (non-black) and on October 19, 2012, it hired John Paul Vargas (non-black) as mail sorters for the CDF operation.

¶ 14   When the CDF operation began, employees frequently spent work time waiting for the trucks to arrive. In early November, work hours dropped, because Metro Air was able to more accurately estimate the arrival time of the mail trucks. Moreover, Hurricane Sandy, which hit New Jersey in late October 2012, temporarily stopped mail shipments and reduced Metro Air's need for mail sorters. Records submitted by Metro Air showed that Wembi worked an average of 40.5 hours per week between September 6, 2012, the start of the CDF operation, and October 28, 2012. One non-black employee worked more hours, 5 non-black employees worked only 10 hours. During the week of October 29, 2012, to November 4, 2012, all employees worked 5.1 to 5.3 hours. From November 5, 2012 to December 16, 2012, the day before Wembi filed his charge, he averaged 25.35 hours, more than any of the other employees. The Department argued Wembi could not establish a *prima facie* case of discrimination because the Department's investigation did not reveal, and Wembi did not provide, substantial evidence that Metro Air treated similarly situated non-black mail sorters more favorably in scheduling work hours. Further, Wembi failed to show that Metro Air's articulated reason for reducing his work hours was a pretext for unlawful discrimination based on race.

¶ 15   On January 31, 2019, the Commission issued its final administrative decision sustaining the Department's dismissal of Wembi's discrimination charge for lack of substantial evidence. The Commission found that Wembi had not established a *prima facie* case of race discrimination because he had not provided, nor had the investigation revealed, any evidence that Metro Air treated similarly situated, non-black mail sorters more favorably. It found that Metro Air reduced

the hours of all mail sorters, regardless of race, and that Wembi was given more hours than non-black fellow employees. Further, Metro Air had articulated a non-discriminatory reason for its actions, *i.e.*, that the work hours of similarly situated non-black mail sorters were also reduced due to changes in operational needs, and Wembi offered no evidence of pretext.

¶ 16 On March 5, 2019, Wembi filed a timely petition for direct administrative review of the Commission's decision with this Court.[2]

¶ 17 ANALYSIS

¶ 18 On appeal Wembi maintains that the Commission erred in dismissing his charge for lack of substantial evidence where it (1) did not take his evidence into consideration; (2) he now has new evidence; (3) Metro Air's evidence was "incorrect"; and (4) his attorney colluded with the Department and the Commission, offering him a settlement "bribe" to drop the case. He further contends that his former attorney's dismissal by his law firm corroborates that the attorney worked with Metro Air.

¶ 19 As an initial matter, we observe that Wembi's *pro se* brief fails to comply with many of the requirements of Illinois Supreme Court Rule 341, which governs the content of appellate briefs. Ill. Sup. Ct. R. 341 (eff. May 25, 2018).[3] For example, his statement of facts does not set forth "the facts necessary to an understanding of the case" and contains argument. See Ill. Sup. Ct. R. 341(h)(6). His argument section contains conclusory, unspecific contentions and neither citations to the record nor citations to legal authority supporting his claims. See Ill. Sup. Ct. R. 341(h)(7). The supreme court rules are not suggestions, and we may strike a brief for failure to comply with

---

[2] Wembi did not include a copy of his petition for review by this court in the record on appeal. However, we take judicial notice of the copy in this court's records.

[3] Wembi did not file a reply brief on appeal.

the rules. *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 12. Further, as the Commission correctly points out, Wembi's failure to support his contentions with citation to legal authority or coherent argument forfeits review of his claims. Ill. Sup. Ct. R. 341(h)(7); *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 57. Nevertheless, it is clear from Wembi's brief that he challenges the Commission's final order and we have the benefit of the Commission's cogent brief. As the issues are evident and the merits of the appeal can be readily ascertained from the short record on appeal, we proceed to the merits of the appeal. See *Twardowski v. Holiday Hospitality Franchising, Inc.*, 321 Ill. App. 3d 509, 511 (2011).

¶ 20    The Act provides that it is a civil rights violation "[f]or any employer to refuse to hire, to segregate, to engage in harassment as defined in subsection (E-1) of Section 2-101, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status." 775 ILCS 5/2-102(A) (West 2012). "Unlawful discrimination" includes discrimination against a person because of his race. 775 ILCS 5/1-103(Q) (West 2012).

¶ 21    A case under the Act is commenced by an aggrieved party's written charge filed with the Department. 775 ILCS 5/7A-102(A)(1) (West 2012). The Department then investigates to determine whether there is substantial evidence that the alleged civil rights violation has been committed. 775 ILCS 5/7A-102(C)(4), (D)(2) (West 2012). "Substantial evidence is evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance." 775 ILCS 5/7A-102(D)(2) (West 2012). If the Department finds there is no substantial evidence that the Act was

violated, the charge is dismissed. 775 ILCS 5/7A-102 (D)(2), (3) (West 2012). The charging party may then commence an action in the circuit court or, as Wembi did here, file a request for review of the dismissal with the Commission. 775 ILCS 5/7A-102 (D)(3) (West 2012).

¶ 22    Upon a properly filed request for review, "the Commission may consider the Department's report, any argument and supplemental evidence timely submitted, and the results of any additional investigation conducted by the Department in response to the request." 775 ILCS 5/8-103(B) (West 2014). Judicial review of the Commission's final order is sought by the filing of a petition for review with this court. 775 ILCS 5/8-111(B)(1) (West 2012).

¶ 23    We review the Commission's final order sustaining the dismissal of a discrimination charge for lack of substantial evidence under an abuse of discretion standard. *Young v. Ill. Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶¶ 32-33. Under this standard, we reverse the Commission's decision only if it was arbitrary and capricious, *i.e.* if it contravenes legislative intent, fails to consider a critical aspect of the matter, or offers an explanation so impossible it cannot be regarded as an exercise of the Commission's expertise. *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 917 (2010). Significantly, we review the final order of the Commission rather than the Department decision. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989). The Commission's findings of fact "shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8-111(B)(2) (West 2012). We will not reweigh the evidence or substitute our judgment for that of the Commission. *Owens*, 403 Ill. App. 3d at 917.

¶ 24    In analyzing employment discrimination claims under the Act, the Commission applies the analytical framework used by federal courts in cases brought under Title VII of the Civil Rights

Act of 1964 (42 U.S.C. § 2000e, *et seq*.). *Zaderaka*, 131 Ill. 2d at 178. Illinois courts look to the decisions of the United States Supreme Court and the United States Court of Appeals for the Seventh Circuit in interpreting the Act. See *Zoepfel-Thuline v. Black Hawk Coll.*, 2019 IL App (3d) 180524, ¶ 26. "[A] plaintiff may prove discrimination in one of two ways. He may attempt to meet his burden by presenting direct evidence that race was a determining factor in the employment decision, or he may use the indirect method of proof for Title VII cases set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Lalvani v. Human Rights Comm'n*, 324 Ill. App. 3d 774, 790 (2001).

¶ 25 Pursuant to the direct method of proof, a complainant may present direct or circumstantial evidence of discrimination. *Sola v. Ill. Human Rights Comm'n*, 316 Ill. App. 3d 528, 537-38 (2000).

¶ 26 Here, the only evidence Wembi presented of direct discrimination was a photograph of an undated spreadsheet showing the one-week work schedules of certain Metro Air employees. It showed that he was scheduled to work 8 hours that week, less than the 14 to 18 hours the other four employees were assigned. But because the schedule is undated, it does not prove that Wembi's hours were reduced during the time period he claimed. Further, Metro Air's evidence revealed that its employees' schedules varied based on "operational needs." Wembi's spreadsheet does not reflect that he was assigned reduced hours based on his race or that similarly situated non-black employees received systematically better treatment than Wembi. As Wembi did not meet the requirements to directly show employment discrimination, he was required to provide indirect evidence of discrimination by satisfying the *McDonnell Douglas* test. See *Zaderaka*, 131 Ill. 2d at 178-79.

¶ 27    Under the indirect method of proof analysis prescribed in *McDonnell Douglas*, the complainant must first make a *prima facie* case of discrimination. *Zaderaka*, 131 Ill. 2d at 178-79. If that is established, a rebuttable presumption arises that the respondent unlawfully discriminated against the complainant. *Id.* at 179. To rebut the presumption, the respondent employer must articulate (not prove), a legitimate, nondiscriminatory reason for its actions. *Id.* If the respondent does so, the complainant is permitted an opportunity to prove that the articulated reason was not the true reason but was instead a pretext for unlawful discrimination. *Id.* The ultimate burden always remains on the complainant. *Id.*

¶ 28    To establish a *prima facie* case of employment discrimination, Wembi had to show that: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate business expectations; (3) he suffered an adverse employment action; and (4) the employer treated others similarly-situated outside his protected class more favorably. *Young*, 2012 IL App (1st) 112204, ¶ 34.

¶ 29    Here, Wembi has failed to make a *prima facie* case. Specifically, Wembi failed to show that similarly situated non-black employees were treated more favorably than he, *i.e.*, that they did not have their work hours reduced. The evidence revealed that from July 23, 2012, to November 25, 2012, 15 non-black employees worked fewer hours on average than Wembi, while only 12 worked more hours. As the Commission noted, the evidence "showed that Metro reduced the hours of all mail sorters regardless of race." Because Wembi did not show that similarly situated non-black persons were treated more favorably, he failed to establish a *prima facie* claim for discrimination. Accordingly, the Commission did not abuse its discretion in sustaining the dismissal for lack of substantial evidence on this basis. See *Young*, 2012 IL App (1st) 112204, ¶¶

47-48 (discrimination claim requires evidence of a similarly situated person treated more favorably in comparable circumstances).

¶ 30  Moreover, Metro Air provided a credible, legitimate, non-discriminatory reason (its business needs) for its reduction of Wembi's work hours, which rebuts any *prima facie* presumption of discrimination. *See Young*, 2012 IL App (1st) 112204, ¶ 36. Although a complainant may argue that an articulated reason was actually a pretext for unlawful discrimination (*Zaderaka*, 131 Ill. 2d at 179), Wembi does not argue pretext in this case and has thus forfeited that argument. *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 23 (an appellant's failure to argue a point in the opening brief results in forfeiture under Supreme Court Rule 341(h)(7)); Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing).

¶ 31  We do not consider Wembi's assertions, for the most part raised for the first time on appeal and unsupported by factual or legal citation, that the Department investigator, his former attorney, Metro Air, and the Commission offered him a bribe to drop the case and failed to properly investigate his case, which he claims was "rigged and corrupted in [] many ways." Issues raised for the first time on appeal are forfeited. *Nationwide Mut. Fire Ins. Co. v. T and N Master Builder and Renovators*, 2011 Il App (2d) 101143, ¶ 23; *See also In re Marriage of Solano*, 2019 IL App (2d) 180011, ¶ 70 ("A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. Points not so developed are forfeited.)

¶ 32                                   CONCLUSION

¶ 33    We conclude that the Commission did not abuse its discretion in sustaining the Department's dismissal of the discrimination charge based on lack of substantial evidence. Accordingly, the decision of the Commission is affirmed.

¶ 34    Affirmed.