2019 IL App (3d) 180524

Opinion filed August 7, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| TRUDY A. ZOEPFEL-THULINE, | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Rock Island County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-18-0524 |
| | ) | Circuit No. 13-L-58 |
| BLACK HAWK COLLEGE, | ) | |
| | ) | The Honorable |
| Defendant-Appellee. | ) | James G. Conway, Jr., |
| | ) | Judge, presiding. |

JUSTICE McDADE delivered the judgment of the court, with opinion.
Presiding Justice Schmidt and Justice Holdridge concurred in the judgment and opinion.

**OPINION**

¶ 1 The plaintiff, Trudy Zoepfel-Thuline, sued the defendant, Black Hawk College (the College), for alleged violations of the Illinois Human Rights Act (775 ILCS 5/1-101 *et seq.* (West 2008)), alleging that the College first delayed offering her employment contracts in retaliation for her reporting sexual harassment, then later terminated her employment in retaliation for the discrimination suit she filed against the College. The circuit court entered summary judgment in favor of the College, and the plaintiff appealed. On appeal, plaintiff argues

that the court erred when it ruled that she was not engaged in a protected activity when she filed her discrimination suit against the College. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        The facts of this case are not in dispute. Those facts relevant to the disposition of this appeal are as follows.

¶ 4        In 2003, plaintiff began teaching General Education Development classes at the College on a part-time basis. For each class plaintiff taught, the College would require her to sign a stand-alone contract, which included, *inter alia*, a provision stating that her employment was subject to cancellation "if the enrollment, funds, or attendance is insufficient to justify holding class, or it is necessary to combine or reassign the class because of its size." Plaintiff was hired by David Harris, the College's outreach coordinator, who was also her direct supervisor.

¶ 5        In August 2009, Terry Urban, the evening receptionist in the College's Community Education Center, approached plaintiff and stated that while looking for vouchers in Harris's desk, she found something that she wanted plaintiff to know about. Plaintiff followed Urban to Harris's desk, and Urban showed her a stack of printed pictures that plaintiff classified as pornographic. The material was located underneath some hanging file folders. Plaintiff stated that she did not have authorization to go into Harris's desk, nor would there be any reason for her to do so.

¶ 6        Urban told plaintiff that she did not know what to do about the situation. Plaintiff told Urban to make copies of the pictures and give them to her so she could report it to the College. When plaintiff reported the situation to Jo Johnson in the College's human resources department, she was directed to mail copies to Johnson, who would follow up with Urban. Regarding her

conversation with Johnson, plaintiff stated, "I wouldn't have said [Harris] had sexually harassed me. I would have said that I found it to be harassment."

¶ 7 The printed pictures listed the websites from which they had been accessed. An October 2009 e-mail exchange between Johnson and Karen Boyd, another administrator in the human resources office, indicated that a network analyst had been asked to perform an initial search of a computer in the Community Education Center that apparently was the suspected source of the printed pictures. However, the analyst did not find any browser history to confirm that suspicion. The e-mail exchange stated that nothing further would be done about the situation.

¶ 8 It does not appear from the record that the initial investigation into the situation included advising Harris that the pictures had been found in his desk or asking him how they came to be in his possession. He did explain their presence in a later affidavit filed with the circuit court. He stated that he had found the pictures in a printer in the Community Education Center's public computer lab and that he had suspected the pictures had been printed by a student whom he had confronted on an earlier occasion about printing the same kind of material. Harris stored the printed pictures in his desk until he could confront the student. He did not see the student following the discovery of the printed pictures, however.

¶ 9 Harris also averred that "[n]o employees, including [Trudy], had authorization to get into my personal work desk or file cabinet—where I had stored the material, nor would their job duties ever require them to do so without my express authorization."

¶ 10 On an afternoon in April 2010, plaintiff found herself short of calculators for her class. She approached Debra Rhodes in the Community Education Center and asked if she had any extras. Rhodes said that she thought Harris had some in his office. While Rhodes looked in

Harris's office, including his desk, plaintiff saw the same printed pictures in the same place in Harris's desk.

¶ 11    During the first week of May 2010, plaintiff received an e-mail in error from Harris, in which he was critical about plaintiff's classroom management abilities. Plaintiff was angered by the e-mail and reported it to Johnson. During that conversation, plaintiff informed Johnson that the printed pictures were still in Harris's desk. Plaintiff asked Johnson what Harris had said about the situation. Johnson replied that he had not been asked about it. Surprised, plaintiff stated:

> "I told her that I didn't care how he came by it, it was his now. It had been in that drawer for over a year. I said, 'I don't know why somebody didn't make him get rid of it, destroy it, whatever, but certainly not keep it in a drawer where faculty, staff and possibly even students could run into it,' and here I had twice, not expecting that would ever happen. I never went into his office, snooping around or, you know, anything. She [Johnson] said they had done a sweep of the computers and they could find nothing."

¶ 12    Shortly after that conversation, human resources directed plaintiff and Harris to draft "expectations lists" for each other. Plaintiff submitted her first expectations list in June 2010. Between June and August 2010, plaintiff resisted requests from administration to attend a meeting regarding the expectation lists, even though she had been told that she would not be offered any contracts unless she attended the meeting.

¶ 13    During the pendency of the expectations-lists issues, on August 9, 2010, plaintiff's regular classes began. The College did not offer her contracts to teach any classes at that point,

- 4 -

instead hiring two substitutes to cover those classes. Eventually, plaintiff was offered contracts in September and returned to teaching in October. In early January 2011, she was offered contracts to teach classes for the Spring semester.

¶ 14    In late January 2011, plaintiff filed a complaint with the Department of Human Rights, alleging that the College refused to offer her contracts for the beginning of the Fall 2009 semester in retaliation for her reporting sexual harassment.

¶ 15    Plaintiff filed another complaint with the Department of Human Rights in February 2011. The new complaint alleged sexual harassment by Harris based on the printed pictures she had seen inside his desk.

¶ 16    Several months later, in June 2011, plaintiff was required to attend two meetings with administration. The first meeting addressed guidelines for interactions she would have with Harris going forward. At the second meeting, plaintiff was informed that she was not going to be offered contracts to teach in the Fall of 2011. Plaintiff responded in July by filing another complaint with the Department of Human Rights, alleging that the College retaliated against her January 2011 filing by permanently terminating her employment.

¶ 17    In August 2011, plaintiff withdrew the sexual harassment complaint she had filed with the Department of Human Rights.

¶ 18    After exhausting her administrative remedies regarding her two retaliation claims, plaintiff filed both claims in the circuit court in January and February 2013.

¶ 19    Over the next four-plus years, the case was continued numerous times for discovery purposes and settlement negotiations. Then, in August 2017, the College filed a motion for summary judgment. After hearing arguments, the circuit court granted the College's motion. In so ruling, the court stated that plaintiff's retaliation claims required her to prove that she had

been engaged in a protected activity when the retaliation occurred, and thus, her sexual harassment claim was still relevant. The court explained:

> "Only from her female co-worker's discovery (and both women's re-discovery) in the desk drawer of Plaintiff's supervisor (David Harris) of photocopies of pornographic pictures; Plaintiff's alleged emotional and moral response to the photos; and her decision to *report* the presence of the photos to BHC administration could proof begin to be made that a law violation that is reasonably believable and possibly could be sufficiently demonstrable to justify protected reporting activity." (Emphasis in original.)

¶ 20    The court found that plaintiff failed to meet her burden of showing a *prima facie* case of sexual harassment:

> "Where there is no evidence in the record made that Harris displayed the photos to Plaintiff; or even invited her to look at them (in his desk drawer or anywhere); or otherwise tried to discuss them, or call them to her attention *at any time* or any place. The Plaintiff has statutorily failed to make any proof of the prohibited conduct *being directed to her, an individual* ***.
>
> * * *
>
> Consequently, if Plaintiff is (presumably) an 'average, ordinary normal' person then as a matter of law her claim(s) that she *believes* it is offensive, unlawful conduct *directed to her* is *not reasonable or logical*." (Emphases in original.)

- 6 -

Further, the court ruled that because "reasonableness" connotes an objective standard, plaintiff's subjective belief that a hostile work environment was created by the presence of the material in Harris's desk was insufficient to show severe or pervasive conditions as required by the law on sexual harassment.

¶ 21       Plaintiff appealed.

¶ 22                                   II. ANALYSIS

¶ 23       On appeal, plaintiff argues that the circuit court erred when it granted the College's motion for summary judgment. Specifically, she claims, *inter alia*, that the court erred when it ruled that she was not engaged in a protected activity when she filed her retaliation suit against the College.

¶ 24       At the summary judgment stage, the circuit court does not resolve questions of fact but determines whether genuine issues of material fact exist. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2014). We review a circuit court's ruling on a summary judgment motion *de novo*. *Adams*, 211 Ill. 2d at 43.

¶ 25       Initially, we note that plaintiff's arguments largely rely on interpretive guidelines from the Equal Employment Opportunity Commission's (EEOC) website and cases from federal appellate circuits other than the Seventh Circuit. However, the EEOC's interpretive guidelines are not law and are not entitled to the type of deference plaintiff seeks. See *National R.R Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002) (stating that EEOC guidelines are not entitled to *Chevron*-level deference (see *Chevron U.S.A. Inc. v. Natural Resources Defense*

*Council, Inc.*, 467 U.S. 837 (1984)); *Kentucky Retirement Systems v. Equal Employment Opportunity Comm'n*, 554 U.S. 135, 150 (2008).

¶ 26     Additionally, regarding the influence of federal precedent in Illinois courts, we first note that section 6-101(A) of the Illinois Human Rights Act (775 ILCS 5/6-101(A) (West 2014)) largely tracks the statutory language used in Title VII of the Civil Rights Act of 1964—specifically, section 2000e-3(a) (42 U.S.C. § 2000e-3(a) (2012)). When addressing discrimination claims brought under section 6-101(A), Illinois courts apply the analytical framework used by the federal courts in Title VII cases. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178 (1989). In so doing, we will accord greater weight to the opinions of the Seventh Circuit on these matters than to the opinions of other federal circuits. The reason for this deference can be found in *Wilson v. Norfolk & Western Ry. Co.*, 187 Ill. 2d 369, 383 (1999). In that case, our supreme court pointed out that because federal district courts in Illinois are bound by Seventh Circuit decisions, Illinois state courts would also adhere to legal principles pertaining to Federal Employers' Liability Act (45 U.S.C. § 51 *et seq.* (1994)) claims that were in accord with Seventh Circuit decisions. *Wilson*, 187 Ill. 2d at 383. The failure to do so would detract from uniform application of a federal statute, depending on whether the case was filed in federal or state court. *Id.* While we are not dealing with the application of a federal statute in this case, the Illinois statute that controls our decision is largely identical to the comparable federal statute. Because we do not want to create disparate treatment of retaliation cases depending on whether they are brought in federal court or state court, and because state and federal courts generally possess concurrent jurisdiction over federal civil rights claims (see generally *Blount v. Stroud*, 232 Ill. 2d 302, 328-30 (2009)), we look primarily to Seventh Circuit decisions for

guidance, when necessary, for the disposition of such cases, including this appeal. See *Wilson*, 187 Ill. 2d at 383.

¶ 27    Turning to the merits of plaintiff's claim, we first note that a claimant can establish employment discrimination through direct or indirect methods of proof. *Hoffelt v. Department of Human Rights*, 367 Ill. App. 3d 628, 632-33 (2006).

> "Under the direct method, the plaintiff must provide either direct evidence or circumstantial evidence that shows the employer acted based on prohibited animus. [Citation.] Under the indirect method, the plaintiff must provide evidence that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. [Citation.]" (Internal quotation marks omitted.) *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 888 (7th Cir. 2004).

Whether via the direct method or the indirect method, a claimant must establish that he or she was engaged in an activity protected under the Human Rights Act. See *id.* at 889; see *Hoffelt*, 367 Ill. App. 3d at 634.

¶ 28    In relevant part, section 6-101(A) of the Illinois Human Rights Act (775 ILCS 5/6-101(A) (West 2014)) provides two ways in which a person's civil rights may be violated through retaliation. First, the "opposition clause" of section 6-101(A) states that it is a civil rights violation to "[r]etaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be *** sexual harassment in employment or sexual harassment in elementary, secondary, and higher education." *Id.*

- 9 -

¶ 29         Second, the "participation clause" of section 6-101(A) states that it is a civil rights violation to "[r]etaliate against a person *** because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act." *Id.*

¶ 30         We first note that a difference exists in the language of the federal statute versus our state statute. While section 2-601(A) of the Illinois Human Rights Act requires, in relevant part, that the claimant hold a reasonable, good faith belief that the conduct opposed constituted sexual harassment, section 2000e-3(a) of the federal Civil Rights Act of 1964 does not contain that language. Nevertheless, in *Mattson*, the Seventh Circuit acknowledged that a "reasonable and good faith" threshold exists for claims brought under Title VII of the Civil Rights Act of 1964:

> "The purpose of requiring that plaintiffs reasonably believe in good faith that they have suffered discrimination is clear. Title VII was designed to protect the rights of employees who in good faith protest the discrimination they believe they have suffered and to ensure that such employees remain free from reprisals or retaliatory conduct. Title VII was not designed to arm employees with a tactical coercive weapon under which employees can make baseless claims simply to advance their own retaliatory motives and strategies. [Citation.]" (Internal quotation marks omitted.) *Mattson*, 359 F.3d at 890.

Further, the *Mattson* court held that this standard applied to opposition-clause-based claims as well as participation-clause-based claims. *Id.* at 891. The *Mattson* court clarified:

"Were we to adopt a different standard, an employee could immunize his unreasonable and malicious internal complaints simply by filing a discrimination complaint with a government agency. Similarly, an employee could assure himself unlimited tenure by filing continuous complaints with the government agency if he fears that his employer will discover his duplicitous behavior at the workplace." *Id.*

Lastly, the *Mattson* court emphasized that this standard set a low bar: "[p]rotection is not lost simply because an employee is mistaken on the merits of his or her charge. Protection also is not lost if an employee drafts a complaint as best he or she can but does not state an effective legal claim." *Id.* at 892.

¶ 31       Because the "reasonable and good faith" language does not appear in the participation clause of section 6-101(A) of the Illinois Human Rights Act, it may appear at first glance that this threshold standard does not apply in participation-clause-based cases. However, the concerns identified by the *Mattson* court regarding federal participation-clause-based cases also apply in Illinois participation-clause-based cases. Absent the "reasonable and good faith" standard applying to participation clause cases, a claimant could insulate a meritless sexual harassment claim simply by filing subsequent retaliation claims. See *id.* at 891. Further, while our supreme court has stated that the Illinois Human Rights Act need not be construed in lockstep with Title VII of the Civil Rights Act of 1964, that statement was made in the context of a key difference between the Illinois Human Rights Act and the Civil Rights Act of 1964—the former mandated strict liability for employers whose employees engaged in sexual harassment, whereas the latter did not always impose strict liability. *Geise v. Phoenix Co. of Chicago*, 159 Ill. 2d 507, 518

(1994). In this case, the federal and state participation clauses contain identical language. Thus, a holding that no "reasonable and good faith" standard applies to participation clause cases would create disparate impacts based on whether a claim was filed in the federal court or our state court—a claimant who filed an unreasonable or bad faith claim could obtain protections in an Illinois court not afforded by the federal courts, despite the identical language used in the federal and state participation clauses. For these reasons, we hold that the "reasonable and good faith" requirement applies not only to section 6-101(A)'s opposition clause, but also to its participation clause. See *Mattson*, 359 F.3d at 891.

¶ 32      With these legal principles established, we turn to the question of whether plaintiff could establish that she was engaged in a protected activity. Regarding count I, she claims that it was both objectively and subjectively reasonable for her to believe she had been subjected to sexually harassing conduct such that her reporting of it was protected. Regarding count II, she claims that she participated in an investigation into the "conduct," such that her filing of the first retaliation charge in January 2011 constituted a protected activity. It is important to note here that even though plaintiff withdrew her sexual harassment claim, it is clear that her two retaliation claims are still predicated upon her act of reporting sexual harassment. Absent a "reasonable and good faith" sexual harassment allegation, she would have had no cognizable claim under the federal or state civil rights statutes. Accordingly, this appeal hinges on whether plaintiff reasonably and in good faith believed that she was subjected to sexual harassment.

¶ 33      The Illinois Human Rights Act defines sexual harassment as follows:

> "any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition

of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." 775 ILCS 5/2-101(E) (West 2014).

¶ 34    The United States Supreme Court has held that sexual harassment is actionable if it is "sufficiently severe or pervasive," such that it alters the employee's employment conditions and creates an abusive work environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Further, the Supreme Court has held that the determination of whether a work environment is hostile or abusive is contextual and depends on factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). *Harris* identified both objective and subjective components to whether a hostile or abusive work environment exists:

> "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21-22.

- 13 -

¶ 35    In this case, the undisputed facts of record do not indicate that a reasonable person would believe that plaintiff was subjected to sexual harassment because no reasonable person looking at the undisputed facts could find any "conduct." First, it is undisputed that plaintiff did not have authorization or reason to go into Harris's desk at any time, so the act of placing or leaving the pictures in his private, restricted drawer cannot be reasonably construed as "conduct" as defined in the Illinois Human Rights Act. Second, it is undisputed that Harris never committed any overt acts toward plaintiff that could be construed as sexual harassment. Third, there are no facts of record to indicate that the mere presence of the printed pictures in Harris's desk—out of plain view and in an area plaintiff had neither authorization nor reason to be—constituted conduct "sufficiently severe or pervasive" such that a reasonable person would conclude a hostile or abusive work environment was created. Under these circumstances, we hold that the undisputed facts could not serve as a basis for plaintiff to establish that her reporting of no conduct of a sexually harassing nature or that her filing of her second complaint with the Department of Human Rights constituted protected activities under either the opposition or participation clauses of the Illinois Human Rights Act.

¶ 36    For the foregoing reasons, we hold that the circuit court did not err when it granted summary judgment in favor of the College.

¶ 37                                III. CONCLUSION

¶ 38    The judgment of the circuit court of Rock Island County is affirmed.

¶ 39    Affirmed.

## No. 3-18-0524

| | |
|---|---|
| **Cite as:** | *Zoepfel-Thuline v. Black Hawk College*, 2019 IL App (3d) 180524 |
| **Decision Under Review:** | Appeal from the Circuit Court of Rock Island County, No. 13-L-58; the Hon. James G. Conway Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Don D. Thuline, of Galva, for appellant. |
| **Attorneys for Appellee:** | Jeffrey D. Wright and Allison K. Wright, of Pappas O'Connor, P.C., of Rock Island, for appellee. |