2024 IL App (1st) 230980-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
June 10, 2024

No. 1-23-0980

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| BRIDGET ALEXANDER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 L 8911 |
| | ) | |
| LOYOLA UNIVERSITY MEDICAL CENTER, | ) | The Honorable |
| | ) | Michael F. Otto, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justice Coghlan concurred in the judgment.
Justice Pucinski dissented.

**ORDER**

¶ 1    *Held:*  The appellate court affirms the trial court's entry of summary judgment in favor of the defendant on the plaintiff's complaint alleging that the defendant wrongfully terminated her employment in retaliation for opposition to unlawful discrimination.

¶ 2    The plaintiff, Bridget Alexander, appeals from the trial court's order granting a motion for summary judgment by the defendant, Loyola University Medical Center (Loyola), on the plaintiff's one-count complaint alleging retaliation in violation of section 6-101(A) of the Illinois Human Rights Act (775 ILCS 5/6-101(A) (West 2018)). For the reasons that follow, we affirm.

¶ 3                                            I. BACKGROUND

¶ 4     The summary judgment record discloses that the plaintiff was an employee of Loyola from April 2, 2001, until July 30, 2019. She was hired into its billing department, and by 2016 she had attained the position of manager of collections. In that role, she oversaw around 20 employees working in the collections department. A substantial number of the collections department's employees are bilingual speakers of Spanish and English, and they frequently spoke Spanish among each other in the office prior to May 2019.

¶ 5     On May 8, 2019, an incident occurred in which a collections department employee named Melissa Connor chastised two other coworkers for conversing in Spanish, telling them that they should be speaking only English in the workplace. The following day, one of the staff members who had been speaking Spanish complained to the plaintiff that Connor's behavior had been rude. Conner also complained to the plaintiff that it was unfair for staff members who spoke Spanish to do so on the job, as she could not understand what they were saying or whether their conversations were personal or work-related.

¶ 6     Later that day, the plaintiff brought the issue to the attention of her supervisor, Anna Carpenter, who was the interim director of Loyola's single billing office. Carpenter told the plaintiff to document the incident and that she would look into it. According to the plaintiff's discovery deposition testimony, on May 22, 2019, Carpenter informed her that she had spoken to Loyola's human resources department about the matter and was told that Loyola had a policy where only English could be spoken during office hours. Upon learning this information from Carpenter, the plaintiff testified that she responded as follows:

> "When she mentioned that there was a policy, a Loyola policy, I said—I asked her
> for the location of the policy because I had never heard of it before. I asked her if the policy
> was only restrictive to our department or if it was wider than that. I asked her—I told her I

had concerns about how do I enforce this, and she said that people can only speak Spanish when they're on their lunch or their brakes and during office hours that people could only speak English in the office.

And so I then asked her—because I had so many questions about this policy that I didn't see written, I asked her if it was possible that I could have a copy of this policy so that I could have a document to support what the directive came from HR. I also asked her at that point during that meeting I asked her if we could involve the Director of Diversity & Inclusion to this conversation.

* * *

Q. After you suggested—after you asked Anna if you could get [the director of diversity and inclusion] involved in the conversation, was it at that point that you expressed to Anna that you didn't feel comfortable enforcing this policy?

A. It told her—when she told me about this Loyola policy for English-only, after the questions I asked her, I told her I didn't feel comfortable enforcing a policy like this because I wasn't sure if it would cross any lines for discrimination, and I didn't want to be accused of discriminating or holding others punitively responsible for violating that policy, and I wasn't sure how to message such a policy with our department when I wasn't sure of the ramifications of that."

¶ 7    Although Carpenter denied in her discovery deposition that she instructed the plaintiff to implement any form of policy, she acknowledged later stating to the Illinois Department of Human Resources (IDHR) that she relayed to the plaintiff a "suggestion" from human resources to encourage colleagues to only speak English on the floor. She also acknowledged stating to IDHR that the plaintiff "refused and said she would not give the guidance to her colleagues because she

felt it was wrong." She testified that it was true that the plaintiff said to her that she would not implement the policy. She testified that "it was clear that [the plaintiff] was uncomfortable with it," and Carpenter testified she did not pursue the issue further. There was a suggestion in Carpenter's testimony that there may have been more than one conversation between them on this topic between May 9, 2019, and May 22, 2019, although this is not clear.

¶ 8        Following their conversation of May 22, 2019, the plaintiff and Carpenter had a phone conversation about the English-only policy with Christin Zollicoffer, the Midwest director of diversity, equity and inclusion for Loyola's parent company, Trinity Health. According to the plaintiff's testimony, she explained to Zollicoffer the incident in which an employee had complained about others speaking Spanish. She also explained that Carpenter had told her that, according to human resources, Loyola had an English-only policy. The plaintiff did not recall how the conversation with Carpenter and Zollicoffer ended, but Zollicoffer told her that she was going to reach out to human resources also.

¶ 9        Zollicoffer's testimony was that sometime in May 2019, she received an e-mail from the plaintiff "trying to understand the policy of when colleagues can use their primary language or a secondary language other than English." Zollicoffer testified that the plaintiff indicated that she was uncomfortable implementing a rule requiring only English to be spoken. She testified that the plaintiff "wanted clarification on the rule and that it was being relegated to someone can only speak another language in the halls and the restrooms, and I wanted to get clarification on that." Zollicoffer testified that there was in fact a draft of a written policy explaining when employees could speak a language other than English, which had been prepared by the general counsel's office. Zollicoffer testified that, in the phone call with the plaintiff and Carpenter, she told them that the draft policy stated that employees could speak in languages other than English in

workspaces as long as it was not meant to exclude others; if they were in a business meeting, they should speak the common language of English but were welcome to use other languages in the workplace. She testified that the draft policy had been created in 2018, but she did not know if it had ever been finalized as a policy.[1]

¶ 10    The plaintiff testified about a further conversation with Zollicoffer, the substance of which was consistent with that Zollicoffer's explanation in the preceding paragraph. The plaintiff testified that this conversation occurred when Zollicoffer came to the office of the collections department to meet with the plaintiff and her staff. However, Zollicoffer testified that the meeting was merely an introduction, and she did not recall whether the English-only policy was discussed.

¶ 11    Other than a conversation with two of her employees in which she relayed the above discussions with Carpenter and Zollicoffer, the plaintiff testified to no further conversations concerning the English-only policy. Diana Orozco, who was one of the team leads within the plaintiff's department, testified in her deposition that the plaintiff told her "that per Anna [Carpenter], we have to tell the staff that they could not speak Spanish on the floor." Orozco responded that such a rule "was going to be a problem." She testified that bilingual members of the department "were taking it as racially insensitive" to be told they could not alternate between speaking Spanish and English, as they were accustomed to doing. Orozco testified that she did convey this rule to her staff, and that people were upset by it. She testified that she informed the plaintiff that staff members were upset, and the plaintiff responded that she would tell Carpenter that "the staff was not taking it well."

---

[1] The summary judgment record includes an undated draft memorandum from Trinity Health (Loyola's parent company) to "All PBS Kentwood colleagues and leaders." It states in pertinent part that "it is expected for all colleagues and leaders to used [*sic*] English only when: *** Communicating with customers or coworkers who only speak English *** [and when] Working on cooperative work assignments with others."

¶ 12    The allegations of the plaintiff's complaint are that, after her discussion with Carpenter on May 22, 2019, in which she refused to enforce the English-only policy as stated by Carpenter to exist, Carpenter began to retaliate by becoming more aggressive with the plaintiff, criticizing her work frequently, telling her that anonymous complaints had been made to human resources by the staff she supervised, and issuing corrective actions against her. The complaint alleges that Carpenter's placing her on a performance improvement plan and her eventual discharge on July 30, 2019, for allegedly unsatisfactory job performance was in retaliation for the protected activity of voicing her concerns about enforcing the English-only policy.

¶ 13    The record indicates that Carpenter started working at Loyola in July 2018. She became the plaintiff's supervisor in August 2018, during a time when the collections department was undergoing various changes. The plaintiff described that these changes involved absorbing a new 12-member team that handled denials and coding, absorbing overflow calls from the customer service department, and handling issues relating to Loyola's acquisition of two new facilities with different collections software. The plaintiff also described that the collections department was understaffed at the time, and it was often expected to handle these changes without clear direction from Loyola's leadership about how it should do so.

¶ 14    Carpenter testified that prior to May 2019, she would characterize her interactions with the plaintiff as "good." She did not recall receiving any direct complaints about the plaintiff prior to May 2019. However, she also testified that throughout that timeframe, the plaintiff would engage in behavior that she considered disrespectful. This included her refusing to move forward with initiatives that they had decided as a team to pursue, stating that she did not have time or that it was not her job. Also, during meetings the plaintiff would "just stop speaking and then she'd say, okay, are we done?" Carpenter testified that this behavior by the plaintiff was not consistent, but

it began to occur more frequently around February and March 2019. Carpenter testified she would discuss these behavioral concerns during weekly one-on-one meetings with the plaintiff.

¶ 15    The first documentation in the record concerning any problem with the plaintiff was on May 15, 2019. Carpenter testified that a meeting occurred that day, during which the plaintiff exhibited behavior that caused Carpenter (in conjunction with Loyola's human resources department) to place the plaintiff on a "performance improvement plan" two weeks later. Carpenter wrote the following summary of the meeting of May 15, 2019:

> "Met with [the plaintiff and others] to brainstorm AR [(accounts receivable)] initiatives. Prior to meeting, I had asked [the plaintiff] to come prepared to present ideas on how we can 'move the needle'. Upon arriving to the meeting, [the plaintiff] entered with a frown and sat at the end of the table. I explained that we have done a lot of great work but we need to do more to move the needle in the right direction. [The plaintiff] did not present any ideas. She stated that her team 'wings it' everyday to try to make a difference. I said that I understood but I can't share that as a concrete initiative with leadership. I told her we need to be creative and think bigger. [The plaintiff] then rolled her eyes and looked down and to the side. She turned her chair and looked out the conference room door the rest of the meeting and did not offer any additional insight. After the meeting, I went to her office to discuss her behavior. I told her that her reaction was very unprofessional and disrespectful. I also told her that my expectation is that she comes prepared to meetings with ideas and a positive attitude. She disagreed that she was being disrespectful."

¶ 16    The plaintiff disputed that Carpenter's follow-up visit to her office was to discuss her behavior, and she testified that she did not believe then that Carpenter was unhappy with how the collections department was performing. She testified that by "winging it," she meant that her team

had a lot of changes imposed by hospital leadership without clear direction about how to meet expectations or support to do so. She testified that in the follow-up discussion, she explained to Carpenter that she had misunderstood her silence and what she interpreted as eye-rolling. The plaintiff also testified that Carpenter had only given her 24 hours' notice in which to come up with ideas for this meeting, and Carpenter had rejected the ideas she brought.

¶ 17     On May 30, 2019, the plaintiff was formally placed on a "performance improvement plan" by Carpenter and Loyola's human resources department. She was provided a document that stated:

> "We have had several prior discussions concerning your inappropriate communication/behavior, colleague management, and understanding of your team's targets. In particular, we have discussed your lack of proactive communication with leadership, preparedness for meetings, and support for organizational initiatives. Thus, you have failed to demonstrate satisfactory performance."

It went on to set forth six areas in which the plaintiff was expected to improve: (1) maintaining a positive attitude and professional demeanor, (2) obtaining Carpenter's approval for time off, (3) providing weekly updates to Carpenter regarding goals, metrics, status of assignments, and ongoing tasks, (4) responding to inquiries in a timely manner, (5) presenting at meetings prepared to discuss objectives and to complete timely follow-up on next steps, and (6) communicating appropriately and accurately to all colleagues. The document informed the plaintiff that she was being placed on a 30-day performance improvement plan to correct these deficiencies, and her failure to do so might result in termination.

¶ 18     Asked about this document, Carpenter testified that there had been many occasions prior to May 30, 2019, when she had shared with the plaintiff that she needed to be careful about her communications, behavior, and the way she came across to others. However, she was not able to

cite any specific examples of this. She also testified that they had previously discussed Carpenter's frustrations as to how the plaintiff was managing her staff members and holding them accountable to their productivity goals, as well as the plaintiff's overall lack of understanding of the metrics and performance expectations that hospital leadership had for the collections department. The plaintiff was unable to motivate her staff to meet those metrics or to speak to those targets when asked, although Carpenter was unable to cite any specific examples of this occurring prior to May 2019. Carpenter testified that these were verbal discussions, and no document existed prior to the implementation of the performance improvement plan reflecting their discussion of these issues.

¶ 19 Carpenter had a meeting with the plaintiff on May 30, 2019, to discuss the expectations and requirements of the performance improvement plan. During that meeting, Carpenter said to the plaintiff that the human resources department had received anonymous complaints about her. She testified that this occurred in the form of one anonymous letter stating that the plaintiff was unprofessional and gave the workplace a negative feeling. Carpenter tendered the letter to the human resources department. The plaintiff asked to see a copy of the letter, and Carpenter told her she was not able to give her a copy of the letter.

¶ 20 The summary judgment record contains substantial detail about how, between May 30, 2019, and July 30, 2019, the plaintiff complied or failed to comply with various aspects of the performance improvement plan. To summarize, this evidence is broken down into the six areas of improvement set forth above. In the area of maintaining a positive attitude and professional demeanor, two incidents are documented in which the plaintiff "rolled her eyes" at Carpenter. A third incident is cited in which the plaintiff made an inappropriate comment to a temp employee who was looking for a permanent position about the fact that prior bad experiences caused her to be unwilling to promote a temp employee to a permanent position. Regarding these incidents,

Carpenter wrote that, despite coaching, the plaintiff was unaware that her reactions and statements are inappropriate and lacked understanding of an expectation of professionalism.

¶ 21    In the area of attendance, the evidence showed that Carpenter asked the plaintiff on June 15, 2019, for an "out of office" plan to address the plaintiff's weekly responsibilities during the plaintiff's upcoming 7-day vacation. Carpenter documented that the plan provided by the plaintiff was incomplete and did not address all of her daily responsibilities.

¶ 22    One requirement of the performance improvement plan was that every Monday, the plaintiff was to e-mail Carpenter with her top weekly goals, areas of concern, payer issues, and associated recommendations and initiatives; then on Friday, the plaintiff was to e-mail a report on progress, "wins," new areas of concerns, and new initiatives. The plaintiff's weekly e-mails between June 7, 2019, and July 8, 2019, are included in the record. Each e-mail is followed by a notation by Carpenter that the plaintiff's goals were insufficiently tied to accounts-receivable metrics, a request by Carpenter that the plaintiff update her goals and initiatives to tie them to those metrics by a particular date, and a notation that the plaintiff had failed to provide updates by that date.

¶ 23    In the area of responsiveness and support of organizational objectives, the evidence indicates that the plaintiff delayed eight days from Carpenter's initial request on the scheduling of an interview with a candidate sent by a temp agency. It also reflects three requests between June 10, 2019, and July 15, 2019, by Carpenter that the plaintiff make efforts to fill three full-time employee positions. Carpenter wrote that the plaintiff's "[c]onsistent delay of response and disregard for my direction has led to insufficient staffing and reduced training timeline."

¶ 24    Finally, the performance improvement plan required the plaintiff to provide Carpenter with a weekly report on staff productivity, areas of opportunity, "next steps" and disciplinary action, and timelines. The evidence indicates that between June 11, 2019, and July 15, 2019, the plaintiff's

productivity reports often failed to include "next steps for under-producers" and that the plaintiff failed to respond to Carpenter's requests to provide this information. It also required the plaintiff to provide a monthly report on quality audits, and the evidence suggests that the plaintiff failed to respond to Carpenter's request for this on three occasions between July 1, 2019, and July 16, 2019.

¶ 25    On July 3, 2019, the plaintiff was formally given a "final warning" in a meeting with Carpenter and a representative of Loyola's human resources department, Felicia Williams. During that meeting, Carpenter said to the plaintiff that the reason for this was because she had failed to make significant progress in several areas of her performance improvement program. The document that was given to the plaintiff in this meeting cited, *inter alia*, the following: (1) her unprofessional response to the temp agency and occasions where she rolled her eyes at Carpenter, (2) failure to consistently measure and understand accounts-receivable metrics, provide weekly goals, and drive initiatives, which negatively impacts the financial state of the organization, (3) failing to respond to e-mails within 24 hours, (4) failure to show urgency in the process of hiring temporary and permanent employees, and (5) failing to provide adequate action steps about how to address low-performing staff-members and reports on quality audits. The plaintiff testified that she was "shocked" upon receiving the final warning, because Carpenter had been telling her at every meeting that she could see that the plaintiff was taking the performance improvement plan seriously and making improvements.

¶ 26    Based on the plaintiff's failure to show improvement in the above areas in the weeks following the final warning, Carpenter met with Williams to discuss termination of the plaintiff's employment with Loyola. On July 30, 2019, they met with the plaintiff and informed her of the termination. Williams testified that she was unaware of any information concerning the plaintiff's reaction to the enforcement of any purported English-only policy.

¶ 27　In her discovery deposition, the plaintiff was asked to explain the basis for her belief that her opposition to the English-only policy led to the retaliation that ultimately resulted in her termination. The plaintiff explained:

"[I]nitially when the PIP [(performance improvement plan)] was given to me and the way that it was given to me, it was all about the nature of my aggression and abusiveness to the colleagues and all of that. And so when I took the PIP in context and started to figure out a plan of how to get Anna [Carpenter] what she wanted and to be compliant with her directives[,] and she started to scrutinize me and she started to accuse me of rolling my eyes when I wasn't[.] *** [N]othing that I did was in agreement with her.

Even though she would say that to my face that, yes, you're doing good, but then I would have a follow-up with now HR, so it kind of got escalated, and so at that point I said this is something different, this is not about the performance improvement because I'm making the improvements, and you're acknowledging publicly that I'm making the improvements, but you're still being severely punitive. And I thought the purpose of a performance improvement plan was to set parameters to then make a way to make improvements, and I was making the improvements. So at that point, that's when I realized this is *** something different."

¶ 28　Loyola moved for summary judgment on two principal grounds. First, it asserted that the evidence had not shown that the plaintiff engaged in protected activity by her reaction to the purported English-only policy. Second, it asserted that no causal connection existed between her reaction to the English-only policy and her placement on the performance improvement plan and eventual termination. It also asserted that placement on the performance improvement plan was not an adverse employment action, and the plaintiff was unable to show that Loyola's reasons for

the plaintiff's termination were pretextual.

¶ 29    The trial court granted Loyola's motion for summary judgment, based upon its finding that the evidence failed to show that the plaintiff engaged in protected activity. The trial court reasoned that the purported English-only policy was a general policy that was not discriminatory against any particular class of individuals protected by antidiscrimination laws. Most significantly, it reasoned that the plaintiff's complaints about it to Carpenter were not connected to any specific protected class. The trial court found that the context of their conversation was insufficient to show that the plaintiff's complaints were connected to a particular protected class or that she had a good faith, reasonable belief that the policy discriminated against a protected class. The plaintiff thereafter filed a timely notice of appeal.

¶ 30                                II. ANALYSIS

¶ 31    On appeal, the plaintiff argues that the trial court erred in granting summary judgment in favor of Loyola on her claim of retaliation. Specifically, she argues that the trial court erred in finding that she did not engage in a protected activity. She further argues that a genuine issue of material fact exists as to the element of causation. Although we agree with the plaintiff as to her first argument, we disagree as to the second and affirm summary judgment on that basis.

¶ 32    A trial court properly grants a motion for summary judgment where the pleadings, depositions, admissions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2022). The appellate court reviews such a ruling *de novo*. *Givens v. City of Chicago*, 2023 IL 127837, ¶ 46. When considering or reviewing such a motion, courts must construe the record strictly against the movant and liberally in favor of the nonmovant, and the motion should be granted only where the movant's right to judgment is clear and free from doubt. *Id.* Where the

nonmoving party is the plaintiff, she does not need to prove her case to avoid summary judgment; however, she must present some evidentiary facts in support of each element of her cause of action that would arguably entitle her to a judgment at trial. *Marquardt v. City of Des Plaines*, 2018 IL App (1st) 163186, ¶ 16. Unsupported conclusions, opinions, or speculation are not sufficient to demonstrate a genuine issue of material fact. *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220, ¶ 20. Where the court determines that a plaintiff is unable to establish a necessary element of his cause of action, summary judgment in favor of the defendant is proper. *Molitor v. BNSF Ry. Co.*, 2022 IL App (1st) 211486, ¶ 36. We may affirm summary judgment on any basis supported by the record, regardless of whether the trial court relied on that basis. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

¶ 33 At the time of the events at issue, section 6-101(A) of the Illinois Human Rights Act provided in part that it is a civil rights violation for a person, or for two or more persons to conspire, to "[r]etaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination." 775 ILCS 5/6-101(A) (West 2018). Based on the similarity of this state statute to comparable federal antidiscrimination statutes, courts assessing claims under it are guided both by Illinois case law and by federal case law applying analogous federal statutes, including among others Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)(1) (2018)) and the antiretaliation provisions of those federal statutes. *Thai v. Triumvera 600 Naples Court Condominium Ass'n*, 2020 IL App (1st) 192408, ¶ 42; *Zoepfel-Thuline v. Black Hawk College*, 2019 IL App (3d) 180524, ¶ 26. This includes the analytical framework used by federal courts in such cases. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178 (1989).

¶ 34 A plaintiff may withstand summary judgment on a claim of retaliation under section 6-101(A)

by producing evidence sufficient to show a genuine issue of material fact that (1) she engaged in a protected activity, (2) her employer committed a material adverse act against her, and (3) a causal nexus exists between the two. *Spencer v. Illinois Human Rights Comm'n*, 2021 IL App (1st) 170026, ¶ 40; *Lau v. Abbott Laboratories*, 2019 IL App (2d) 180456, ¶ 65; accord *Skiba v. Illinois Central Railroad Co.*, 884 F.3d 708, 718 (7th Cir. 2018). If the plaintiff does so, a *prima facie* case is established, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Thai*, 2020 IL App (1st) 192408, ¶ 43. If the defendant does so, then to avoid summary judgment the plaintiff must present evidence raising an inference that the adverse action was motivated, at least in part, by an improper retaliatory motive. *Id.* ¶ 45. The plaintiff may do so by presenting evidence that the defendant's proffered reason is pretext. *Id.*

¶ 35    The trial court granted summary judgment based on element (1), finding that the plaintiff did not engage in a protected activity under the statute. In this context, engaging in protected activity means that the plaintiff "opposed that which he or she reasonably and in good faith believes to be unlawful discrimination." 775 ILCS 5/6-101(A) (West 2018). This standard sets a "low bar" whereby protection is not lost if an employee is mistaken about whether perceived discrimination is unlawful, provided the employee's belief is reasonable and in good faith. See *Zoepfel-Thuline*, 2019 IL App (3d) 180524, ¶¶ 30-31; accord *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1314 (7th Cir. 1989). Internal complaints to managers or other appropriate persons are sufficient expressions of opposition. *Lau*, 2019 IL App (2d) 180456, ¶ 67. Also, informal complaints may constitute protected activity for purposes of retaliation claims. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). However, as the second district has explained:

"[T]he substance of the complaint must be sufficient to put the employer on notice that the plaintiff reasonably believes that prohibited discrimination has occurred. Although no

particular 'magic words' are required [citation], ' "the complaint must indicate [that] discrimination occurred because of sex, race, national origin, or some other protected class." ' *Skiba*, 884 F.3d at 718 (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). 'Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.' *Tomanovich*, 457 F.3d at 663." *Lau*, 2019 IL App (2d) 180456, ¶ 67.

¶ 36 Relying upon the passage of *Lau* set forth in the preceding paragraph, the trial court below found that the evidence failed to show that the plaintiff's complaints about the purported English-only policy were connected to any specific protected class. The court reasoned that a policy requiring employees to speak only English at work was broad and general; the fact that the plaintiff opposed that general policy in the specific context of managing a department with many Spanish-speaking employees does not make that policy discriminatory. Likewise, the court found that her questioning of how to enforce it within that context does not amount to a complaint that the policy was discriminatory against any protected class or that she had a reasonable, good faith belief that it was discriminatory against any particular protected class.

¶ 37 The plaintiff argues that the trial court erred in two regards. First, it focused too narrowly on the fact that the plaintiff did not mention a specific protected class in her statement to Carpenter. She argues that a trier of fact could reasonably infer from context that she was expressing a concern that Loyola's purported English-only policy was discriminatory based on race or national origin against the Spanish-speaking employees of her department. Second, it focused too narrowly on whether an English-only policy is actually discriminatory against any one specific race or nationality, instead of considering whether a trier of fact could reasonably conclude that the

plaintiff, a nonlawyer, reasonably and in good faith believed it to be unlawful discrimination.

¶ 38    We agree with the plaintiff's argument on this element. Starting with her second point, this court's research reveals no bright-line answer to the question of whether an employer's rule requiring employees to speak only English at work violates federal antidiscrimination laws. For example, in *Moldonado v. City of Altus*, 433 F.3d 1294, 1304 (10th Cir. 2006), the court of appeals recognized that "English-only policies are not always permissible" and found that the policy in the case before it was evidence of a hostile work environment for Hispanic employees. In *Equal Employment Opportunity Comm'n v. Premier Operator Services, Inc.*, 113 F. Supp. 2d 1066, 1073 (N.D. Tex. 2000), the district court stated, "While English-only rules may be seen as facially neutral, they disproportionately burden national origin minorities because they preclude many members of these groups from speaking the language in which they are best able to communicate, while rarely, if ever, having that effect on non-minority employees." One of the most recent federal cases to thoroughly address the issue offered the following summary of the law:

> "[P]laintiffs challenging an English-only policy under Title VII will not necessarily be able to make out a *prima facie* case (under any theory [*i.e.*, disparate treatment, disparate impact, or hostile work environment]) based solely on the presence of an English-only policy. But the policy itself, and the apparent purposes behind its adoption, are factors that may be considered. There may be cases where the policy at issue is so egregiously overbroad that nothing more will be needed to defeat a motion for summary judgment." *Reyes v. Pharma Chemie, Inc.*, 890 F. Supp. 2d 1147, 1164 (D. Neb. 2012).

¶ 39    In our state, the Illinois Human Rights Commission and the IDHR have promulgated a joint rule on this topic which states:

> "(a) An employer may not have a rule requiring that employees speak only in English

at all or at certain times where the rule has the purpose or effect of discriminating against individuals on the basis of national origin. It is a defense to an allegation that a 'speak English' rule has a disparate impact on a particular national origin group to show that the rule is justified by business necessity.

(b) It is common for an individual whose primary language is not English to inadvertently change from speaking English to speaking his or her primary language. Therefore, if an employer believes it has a business necessity for a speak-English-only rule at certain times, the employer should inform its employees of the general circumstances when speaking only in English is required and of the consequences of violating the rule. If an employer fails to effectively notify its employees of the rule and makes an adverse employment decision against an individual based on a violation of the rule, the Human Rights Commission ('the Commission') and the Department will consider the employer's application of the rule as evidence of discrimination on the basis of national origin." 56 Ill. Adm. Code 5220.800 (eff. Oct. 25, 1986).

The federal Equal Employment Opportunity Commission has promulgated a similar rule (see 29 C.F.R. § 1606.7 (2018)), although "courts are split on how to treat these guidelines." *Reyes*, 890 F. Supp. 2d at 1163.

¶ 40     We do not set forth the statements above in any attempt to resolve Illinois law on this issue. Instead, we do so to illustrate that the lawfulness of an employer imposing an English-only rule on employees is a nuanced legal issue about which a person could hold a reasonable, good-faith belief that this is unlawful discrimination, regardless of whether that belief is legally accurate. We believe that the trial court here may have taken an overly simplistic approach in stating that the English-only rule, as testified to by the plaintiff, was nondiscriminatory.

¶ 41    We also agree with the plaintiff that her claim does not fail on the basis that she did not explicitly connect her complaint of discrimination to a specific protected class. Instead, we believe a trier of fact could reasonably infer from the context of the conversation that the plaintiff's complaints of discrimination concerning the purported English-only policy were connected to the Hispanic race and national origin of the employees that she managed in her department, and that Carpenter understood this to be the case. It is clear that the plaintiff's statements to Carpenter were in reference to the Spanish-speaking employees of the collections department. The close connection that exists between the language someone speaks and that person's race or national origin supports drawing the reasonable inference that this was the form of discrimination that the plaintiff was opposing. See *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 948 (9th Cir. 1995) ("Since language is a close and meaningful proxy for national origin, restrictions on the use of languages may mask discrimination against specific national origin groups"), *vacated on other grounds*, 520 U.S. 43 (1997); 56 Ill. Adm. Code 5220.800 (eff. Oct. 25, 1986) (recognizing discrimination based on national origin as the risk posed by an employer's English-only rule).

¶ 42    The context here, along with the close link between race and national origin, distinguishes this case from *Lau* and other cases cited by Loyola that involved much more tenuous connections between a plaintiff's complaint and unlawful discrimination against a protected class. In *Lau*, the court held that a plaintiff's complaint to an employment relations representative that her supervisor was "biased" and treated her less favorably than a younger white male coworker, which was made in connection with statements that the supervisor was overly critical of the plaintiff's work, could not be reasonably interpreted as a claim of unlawful discrimination against a protected class. *Lau*, 2019 IL App (2d) 180456, ¶¶ 64-71. In *Skiba*, the plaintiff's e-mails to human resources were held not to be protected activity where they mentioned only a "personality conflict" with a supervisor

and stated that he berated and disrespected subordinates, without referencing discriminatory animus against a protected class. *Skiba*, 884 F.3d at 718. In *Tomanovich*, two grievances filed by the plaintiff were held not to be protected activity where one mentioned only pay discrimination without asserting that it resulted from his membership in a protected class, and the second involved harassment without referencing sexual harassment. *Tomanovich*, 457 F.3d at 663-64.

¶ 43        By contrast, in this case, we find a genuine issue of material fact as to whether the plaintiff engaged in protected activity by expressing concern to Carpenter that she could be engaging in discrimination by enforcing the English-only policy against the Spanish-speaking employees of her department, refusing to do so, and involving the director of diversity, equity and inclusion in the discussion about the policy's enforcement.

¶ 44        However, despite our agreement with the plaintiff's argument concerning her engagement in a protected activity, we nevertheless find that the evidence shows no genuine issue of material fact as to the existence of a causal nexus between her opposition to the purported English-only policy and Loyola's termination of her employment two months later.

¶ 45        "A retaliation claim requires proof of causation, which in this context means but-for causation." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013)); accord *Lau*, 2019 IL App (2d) 180456, ¶ 39 n.1. This does not mean that that the protected activity must have been the only cause of the adverse action, but rather that the adverse action would not have happened without the protected activity. *Adebiyi v. South Suburban College*, 98 F.4th 886, 892 (7th Cir. 2024). "The question is: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?' " *Khungar v. Access Community Health Network*, 985 F.3d 565, 578 (7th Cir. 2021) (quoting *Lord*, 839 F.3d at

563, citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

¶ 46   On appeal, the plaintiff argues that evidence of causation is shown by the temporal proximity of the plaintiff making Carpenter aware of the incident involving Conner chastising the two Spanish-speaking staff members (May 9, 2019), the first documentation by Carpenter of criticisms of the plaintiff's behavior or work performance (May 15, 2019), the plaintiff's complaints about and refusal to implement the English-only policy (May 22, 2019), the plaintiff's reaching out to involve the director of diversity and inclusion in the discussion about the policy (later in May 2019), and Carpenter's implementation of the performance improvement plan (May 30, 2019) that ultimately led to her termination. The plaintiff also argues that the evidence shows that Carpenter increased her workload after she was placed on the performance improvement plan and that Carpenter increased her criticisms despite evidence that the collections department was meeting or exceeding its goals during this time.

¶ 47   A short time span between an employee's engaging in protected activity and an employer's adverse act can be circumstantial evidence of causation in a retaliation case. *Hoffelt v. Illinois Department of Human Rights*, 367 Ill. App. 3d 628, 638 (2006). However, as the plaintiff acknowledges, temporal proximity is rarely sufficient, by itself, to show a genuine issue of material fact as to causation. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012); accord *Davis v. Times Mirror Magazines, Inc.*, 297 Ill. App. 3d 488, 496 (1998) (state law retaliatory discharge case). Additional corroborating evidence is generally necessary to support an inference of a causal connection based on suspicious timing. *Igasaki v. Illinois Department of Financial & Professional Regulation*, 988 F.3d 948, 960 (7th Cir. 2021). This is particularly so where evidence shows an alternative explanation for the challenged action that tends to negate the inference of causation that may be drawn from temporal proximity. See *Jokich v. Rush University Medical Center*, 42 F.4th

626, 634 (7th Cir. 2022).

¶ 48    We have carefully reviewed the evidence in this case on the issue of causation. Although we recognize that some overlap exists in the timeframe of events giving rise to the plaintiff's opposition to the English-only policy and the imposition of the performance improvement plan, this temporal proximity is not sufficient to warrant an inference of causation here. This is because the evidence shows documented problems with plaintiff's work performance and behavior prior to the time she had any knowledge of an English-only policy. In other words, the evidence shows that on May 15, 2019, the plaintiff came unprepared to a meeting to discuss ideas for accounts receivable initiatives, that she acted in a withdrawn and disrespectful manner after her ideas were rejected, and that Carpenter reprimanded her for this after that meeting ended. The evidence suggests that the plaintiff's lack of preparedness and behavior at this meeting led to the imposition of the performance improvement plan two weeks later. Although this meeting occurred after the incident involving Conner and the two Spanish-speaking employees, it occurred prior to the plaintiff having any knowledge about an English-only policy. There is no evidence that the plaintiff made any statement in opposition to the English-only policy prior to May 22, 2019, which was a full week after that meeting.

¶ 49    Accordingly, additional corroborating evidence is necessary to support an inference of a causal connection based on the timing of events, but we find nothing in the record that does so. In our view, the critical evidence missing from this case is something to suggest that Carpenter had some sort of negative reaction after the plaintiff questioned or expressed opposition to enforcing the English-only policy. However, the plaintiff's appellate brief cites no evidence on this point, and we find nothing in her deposition about Carpenter's reaction to her opposition to the policy. Carpenter's testimony was that she did not pursue the issue once she realized that the plaintiff was

uncomfortable with it. Without some sort of evidence along these lines, we find it entirely speculative to infer that the plaintiff's termination was in retaliation for her opposition to the English-only policy or that she would have kept her job but-for her opposition to it.

¶ 50 The absence of evidence of a causal link is demonstrated by the plaintiff's own deposition testimony. When the plaintiff was asked to explain why she believed that a connection existed between her raising concerns about the English-only policy and her placement on the performance improvement plan, she said nothing in her answer about the English-only policy. *Supra* ¶ 27. Instead, she explained that, after the performance improvement plan was underway, she eventually came to the realization that "something different" (other than a plan to improve her performance) was occurring because none of her efforts to comply with Carpenter's directives seemed to satisfy her, and Carpenter escalated the matter to human resources despite stating to the plaintiff's face that she was doing good and making improvements. Quite simply, we find nothing in the record to warrant the inference that the "something different" referred to in this answer was the plaintiff's opposition to the English-only policy.

¶ 51 Based upon our holding that no genuine issue of material fact exists on the element of causation in the plaintiff's claim for retaliation, the trial court's granting of summary judgment in favor of the defendant on that claim is affirmed.

¶ 52                                      III. CONCLUSION

¶ 53 For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 54 Affirmed.

¶ 55 JUSTICE PUCINSKI, dissenting.

¶ 56 With respect, I dissent.

¶ 57       "Summary judgment is appropriate where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits reveal no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Atchison, Topeka and Santa Fe Ry. Co. v. St. Paul Surplus Lines Ins. Co.*, 328 Ill. App. 3d 711, 714 (2002) (citing 735 ILCS 5/2-1005(c) (West 1998)).

¶ 58       There are at least two critical issues of material fact that need to be fleshed out at trial as to whether there was a causal relationship between plaintiff's expressed concern about the "English Only" policy and her termination.

¶ 59       First, the record is unclear as to whether defendant had documented any concerns about plaintiff's job performance or behavior until *after* she complained in May 2019 about the verbal, unofficial, "English Only" directive/policy. For example, the record does not show there were any prior performance evaluations that indicated discipline was looming.

¶ 60       Moreover, the record presented a fact question as to whether defendant directed plaintiff to enforce an "English Only" directive, which was not identified as an official policy but which nonetheless governed the complex relationship between employees' personal and work-related communication.

¶ 61       Since summary judgment is supposed to be rare and only when there are no material issues of fact, I do not agree that summary judgment for defendant in this case was correct.